**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5148**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————

NATIONAL COUNCIL OF NONPROFITS, et al.,

Plaintiffs-Appellees,

v.

OFFICE OF MANAGEMENT AND BUDGET, et al.,

Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the District of Columbia

—————————————

**OPENING BRIEF FOR APPELLANTS**

—————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.     Parties and Amici

Plaintiffs-appellees are National Council of Nonprofits, American Public Health Association, Main Street Alliance, and SAGE.  Defendants-appellants are the Office of Management and Budget and Russell T. Vought, in his official capacity as OMB Director.  The district court denied Beatrice Adams's motion to intervene.  The American Center for Law and Justice was amicus in district court.

### B.     Rulings Under Review

The rulings under review were entered in *National Council of Nonprofits v. Office of Management and Budget*, No. 25-cv-239 (D.D.C.), by the Honorable Loren L. AliKhan.  They are the February 25, 2025 order and opinion granting a preliminary injunction (Dkt. Nos. 51, 52).  The district court's opinion is published at *National Council of Nonprofits v. Office of Management and Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025).

C.    **Related Cases**

This case was not previously before this Court.  Related issues are pending before the First Circuit in *New York v. Trump*, Nos. 25-1236, 25-1413 (1st Cir.), and *Woonasquatucket River Watershed Council v. USDA*, No. 25-1428 (1st Cir.).  Counsel is not aware of any other pending related cases.

*/s/ Sean R. Janda*
Sean R. Janda

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUES ......................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    A.    Legal and Factual Background ............................................ 4

    B.    Procedural Background ........................................................ 5

SUMMARY OF ARGUMENT ............................................................. 9

STANDARD OF REVIEW ................................................................. 11

ARGUMENT ....................................................................................... 12

I.    Plaintiffs Are Not Likely to Succeed on the Merits ................. 12

    A.    Plaintiffs' Challenges to the Rescinded Memorandum Are Moot ................................................................................ 12

    B.    The District Court Fundamentally Misunderstood the OMB Memorandum ............................................................. 18

    C.    The OMB Memorandum Was Lawful ................................. 24

        1.    OMB Had Statutory Authority to Issue the Memorandum ............................................................. 25

        2.    The OMB Memorandum Was Reasonable and Reasonably Explained ........................................... 30

3.    The OMB Memorandum Did Not Violate the First
      Amendment ............................................................................34

II.    The Equitable Factors Do Not Support a Preliminary Injunction.......38

III.   The District Court's Universal Injunction Was Overbroad...................42

CONCLUSION.......................................................................................................49

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                              **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ............................................................... 37

*Akiachak Native Cmty. v. U.S. Dep't of the Interior*,
    827 F.3d 100 (D.C. Cir. 2016) ..................................... 13, 17

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ................................................................. 13

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ............................................. 48

*Bradford v. U.S. Dep't of Labor*,
    101 F.4th 707 (10th Cir. 2024) ......................................... 30

*Building & Constr. Trades Dep't v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ....................................... 24, 25

*Clarke v. United States*,
    915 F.2d 699 (D.C. Cir. 1990) ........................................... 14

*Corrigan v. Boston Univ.*,
    98 F.4th 346 (1st Cir. 2024) .............................................. 15

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ....................................... 41-42

*Department of Educ. v. California*,
    604 U.S. 650 (2025) ....................................................... 40, 41

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................. 31

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
    129 F.3d 826 (5th Cir. 1997) ............................................. 47

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................. 13

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ........................................................ 12

*Harris v. McRae,*
    448 U.S. 297 (1980) ......................................................................... 35

*J.D. v. Azar,*
    925 F.3d 1291 (D.C. Cir. 2019) ........................................................ 36

*Lyng v. International Union, United Auto., Aerospace &*
    *Agric. Implement Workers of Am.,*
    485 U.S. 360 (1988) ......................................................................... 35

*Meyer v. Bush*
    981 F.2d 1288 (D.C. Cir. 1993) ........................................................ 27

*Missouri ex rel. Nixon v. Craig,*
    163 F.3d 482 (8th Cir. 1998) ........................................................... 14

*National Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ......................................................................... 35

*National Insts. of Health v. American Pub. Health Ass'n,*
    145 S. Ct. 2658 (2025) ..................................................................... 40

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................... 12, 38

*Ohio v. U.S. EPA,*
    969 F.3d 306 (6th Cir. 2020) ........................................................... 17

*Public Citizen, Inc. v. OMB,*
    598 F.3d 865 (D.C. Cir. 2010) ......................................................... 27

*Regan v. Taxation With Representation of Washington,*
    461 U.S. 540 (1983) ......................................................................... 35

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ............................................................. 35, 36, 37

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) .................................................................... 25, 30

*Sierra Club v. Costle,*
  657 F.2d 298 (D.C. Cir. 1981) ......................................................... 26

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) ........................................................... 44

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) .......................................................... 42, 43, 44, 48

*University of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ......................................................................... 17

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
  559 F.2d 841 (D.C. Cir. 1977) ........................................................ 38

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ......................................................................... 30

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................. 12

## Statutes:

Administrative Procedure Act (APA):
  5 U.S.C. § 702(1) ............................................................................ 46
  5 U.S.C. § 705 .......................................................................... 43, 45
  5 U.S.C. § 706 ................................................................................ 43
  5 U.S.C. § 706(2) ............................................................................ 44

28 U.S.C. § 1292(a) ........................................................................... 3

28 U.S.C. § 1331 ............................................................................... 3

31 U.S.C. § 501 ............................................................................... 27

31 U.S.C. § 503(a)(2) ....................................................................... 27

## Regulatory Materials:

2 C.F.R. § 200.340(a)(4) .................................................................. 26

Exec. Order No. 14,154,
    90 Fed. Reg. 8353 (Jan. 29, 2025) ...................................................... 4

Proclamation No. 10,142,
    86 Fed. Reg. 7225 (Jan. 20, 2021) ...................................................28

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................... 3

Fed. R. Civ. P. 23 .............................................................................. 48

Fed. R. Civ. P. 65(c) ......................................................................... 40

Fed. R. Civ. P. 65(d)(1)(C) ............................................................... 39

**Legislative Material:**

H.R. Rep. No. 79-1980 (1946) ......................................................45, 46

**Other Authorities:**

*Ensuring Responsible Spending of Recovery Act Funds*,
    74 Fed. Reg. 12,531 (Mar. 20, 2009) ............................................. 28

OMB Memorandum M-25-13, *Memorandum for Heads of
    Executive Departments and Agencies* (Jan. 27, 2025) ......... 5, 19, 20, 21, 22,
                                                            31, 32, 35, 36, 37, 41

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| OMB | Office of Management and Budget |

**INTRODUCTION**

Plaintiffs challenge a memorandum issued in January and rescinded in February by the Office of Management and Budget (OMB). The OMB Memorandum generally directed agencies to submit information about federal funding programs relating to any of seven then-recent Executive Orders to allow the new Administration to review the programs and ensure that federal funds were spent in accordance with the President's priorities. And the Memorandum instructed agencies to temporarily pause—if consistent with applicable law—disbursing federal funds under those programs pending that review. Shortly after this lawsuit was filed, the Memorandum was rescinded.

Nonetheless, plaintiffs continued to press their claims, and the district court granted a preliminary injunction that broadly prohibits agencies from implementing or reinstating the OMB Memorandum's directives with respect to the disbursement of funds under all open awards. In determining that plaintiffs were entitled to that relief, the district court primarily relied on its belief that the Memorandum amounted to a command to agencies to execute a categorical, indefinite funding freeze.

That decision was erroneous on all levels. At the outset, the district court fundamentally misunderstood the OMB Memorandum, which envisioned only a limited, temporary funding freeze tied to the specific reviews contemplated by the President's Executive Orders and which expressly instructed agencies to pause funding only when permitted to do so by applicable law. With that proper understanding, plaintiffs cannot succeed on their claims against the Memorandum. Not only are those claims now moot because the Memorandum has been rescinded, but the Memorandum and underlying Executive Orders were routine and permissible exercises of the President's and OMB's power to instruct the President's subordinates in the Executive Branch on how to carry out discretionary authorities.

In nonetheless enjoining the Memorandum, the district court improperly intruded on the President's Article II authority to direct his subordinates and to ensure that federal funding programs are aligned, where legally permitted, with his policy priorities. And the district court compounded the problem with its vague and overbroad injunction, which chills legitimate agency activity and which goes well beyond what would be necessary to provide complete relief to plaintiffs. This Court should vacate or reverse.

2

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. *See* J.A. 17. For the reasons explained below, *see infra* pp. 12-18, the district court lacked jurisdiction over plaintiffs' claims because there was no longer a live case or controversy at the time the district court ruled. The district court entered an order granting plaintiffs a preliminary injunction on February 25, 2025. *See* J.A. 354. The government filed a timely notice of appeal on April 24, 2025. J.A. 356; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether plaintiffs' claims challenging the rescinded OMB Memorandum are moot;

2. Whether the OMB Memorandum was lawful;

3. Whether the relevant equitable factors supported the district court's entry of a preliminary injunction; and

4. Whether the district court's universal injunction is overbroad.

3

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

In the days after his inauguration, the President issued several

Executive Orders setting forth Administration priorities and instructing

agencies to pause funding where legally permissible to allow time to review

whether that funding aligns with those priorities.  For example, Executive

Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025), titled *Unleashing*

*American Energy*, declares the policy of the United States to encourage

certain "energy exploration and production," guarantee the accessibility of

"an abundant supply of reliable energy," and ensure that no federal funding

is "employed in a manner contrary to the principles outlined in this section,

unless required by law," *id.* § 2(a), (c), (i), 90 Fed. Reg. at 8353-54.  The

American Energy Executive Order further instructs agencies to

"immediately pause the disbursement of funds" under two federal statutes to

assess "consistency with the law and the policy outlined in" the Executive

Order, *id.* § 7(a), 90 Fed. Reg. at 8357, but provides that all implementation

must be "in a manner consistent with applicable law," *id.* § 10(b), 90 Fed.

Reg. at 8359.

On January 27, OMB issued a memorandum that called for agencies to review federal financial assistance programs "consistent with the President's policies and requirements."  OMB Memorandum M-25-13, at 1, *Memorandum for Heads of Executive Departments and Agencies* (Jan. 27, 2025) (OMB Mem.).  While that review was ongoing, agencies were to "temporarily pause all activities related to obligation or disbursement" of funds "and other relevant agency activities that may be implicated by [the President's] executive orders," "to the extent permissible under applicable law."  *Id.* at 2 (emphasis omitted).  The next day, OMB released guidance reiterating that the pause applied only to funding implicated by the President's recent Executive Orders and that agencies should pause funding only if consistent with underlying law.  *See* J.A. 62-63.

### B.    Procedural Background

1.  The day after the OMB Memorandum was issued, plaintiffs—two nonprofit organizations, one "network of nonprofit organizations," and one "network of small businesses"—brought this suit challenging the Memorandum.  J.A. 15-16.  Plaintiffs claimed that the Memorandum was arbitrary and capricious, violated the First Amendment, and exceeded OMB's statutory authority.  *See* J.A. 27-30.

5

The same day, the district court entered what it called an "administrative stay" of the OMB Memorandum insofar as it directed "that agencies pause disbursement of Federal funds under all open awards." J.A. 67 (alteration and quotation omitted). After the entry of that administrative stay, OMB rescinded the Memorandum. J.A. 69. That rescission did not affect the President's Executive Orders, which continue to direct agencies to carry out the President's policy directives, consistent with applicable law.

Shortly thereafter, the district court entered a temporary restraining order that prohibited defendants from "implementing, giving effect to, or reinstating under a different name the directives" in the OMB Memorandum as applied to "all open awards." J.A. 286. In entering that order, the court concluded that the OMB Memorandum was likely arbitrary and capricious; the court did not reach plaintiffs' remaining claims. J.A. 280-83.

2. Plaintiffs then moved for a preliminary injunction, and the district court granted that motion. As relevant here, the court first concluded that the rescission of the OMB Memorandum did not moot plaintiffs' claims. In the court's view, the voluntary-cessation doctrine prevented those claims from becoming moot because the government could not adequately demonstrate that it would "not resume the challenged activity." J.A. 330

6

(quotation omitted).  In reaching that conclusion, the court placed heavy

emphasis on a social-media post from the White House Press Secretary,

which emphasized that the President's Executive Orders continued to direct

some pauses in federal funding.  *See* J.A. 330-31.  In the court's view, that

post suggested that the challenged conduct continued.  *Id.*

On the merits, the district court concluded that plaintiffs were likely to

succeed on their claims that the OMB Memorandum exceeded the agency's

statutory authority and was arbitrary and capricious.  As to the OMB's

statutory authority, the court concluded—relying in large part on principles

of the major-questions doctrine—that OMB lacked any "clear statutory

hook" for the authority to "freeze as much as $3 trillion."  J.A. 346-47.  And

as to the Memorandum's reasonableness, the court concluded that the

agency had not "provide[d] a reasonable explanation for why they needed to

freeze all federal financial assistance in less than a day" and had improbably

"ignored significant reliance interests."  J.A. 343-44.

In addition, the district court stated that plaintiffs had "shown some

likelihood of success" on their claim that the OMB Memorandum violated the

First Amendment by directing the pause of disbursements "that could be

connected to" particular "concepts."  J.A. 347-49.  The court stopped short,

7

however, of holding that plaintiffs were in fact likely to succeed on that claim, instead concluding only that the Memorandum "may be crossing a constitutional line."  J.A. 349.

Next, the district court held that the equities supported a preliminary injunction.  The court concluded that plaintiffs had demonstrated that they would suffer irreparable harm from any "pause on federal funding," based on affidavits from some plaintiffs or their members stating that a pause on federal funding would lead those organizations to "suffer existential injuries."  J.A. 350 (quotation omitted).  And the court held that the balance of the equities and the public interest weighed in favor of a preliminary injunction, because "the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated."  J.A. 351.

The district court thus entered a universal preliminary injunction, which enjoined defendants "from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in [the OMB Memorandum] with respect to the disbursement of Federal funds under all open awards."  J.A. 354.  In entering that injunction, the court did not explain why it believed that universal relief, rather than relief limited to plaintiffs or their members, was warranted.

8

## SUMMARY OF ARGUMENT

I.  Plaintiffs are unlikely to succeed on their challenges to the OMB Memorandum, which has been rescinded and which was lawful in any event. At the outset, plaintiffs' challenges to the Memorandum, which has since been rescinded, are moot.  The OMB Memorandum arose in the specific context of a programmatic review tied to seven Executive Orders issued at the beginning of the new Administration.  There is no basis to conclude that such circumstances will materialize again.  And plaintiffs' challenges to the Memorandum were specific to the circumstances in which the Memorandum was issued.  There is no plausible basis for expecting the dispute presented in this case to recur.

Regardless, plaintiffs' challenges were unavailing on the merits even before the Memorandum was rescinded, and the district court's contrary conclusion rested on a fundamental misunderstanding of the Memorandum. In the district court's view, the OMB Memorandum required agencies to "freez[e] all federal financial assistance under open awards."  J.A. 315.  But that characterization is impossible to square with the text of the Memorandum, which reflects more limited internal directions to agencies. The Memorandum required agencies to submit information to OMB

9

regarding federal programs implicated by any of seven Executive Orders to allow the Administration to determine whether continued funding of those programs cohered with the Administration's priorities.  Pending that review, the Memorandum instructed agencies to temporarily pause funding under those programs—but only if permissible under applicable law.  And OMB exempted various programs from those instructions.

With that proper understanding of the OMB Memorandum, it is clear that plaintiffs' claims fail on the merits.  The Memorandum reflected a proper exercise of the President's and OMB's authority to issue guidance to the Executive Branch directing agency officials.  The Memorandum reasonably explained that a temporary pause on certain funding—which included multiple exceptions—was necessary to effectuate the President's Executive Orders and safeguard federal funds.  And the Memorandum, which related only to government funding, does not implicate the First Amendment.

II.  The equities also counsel against the district court's preliminary injunction.  The injunction substantially harms the government's and the public's interests by undermining the President's Article II authority to direct his subordinates.  And the injunction impermissibly contains vague

10

instructions that threaten to chill agencies from taking legally permissible actions to ensure that funding is aligned with the President's policy priorities. By contrast, plaintiffs' asserted harms are relatively minimal. Not only do plaintiffs have no cognizable interest in receiving funds to which they are not entitled, but plaintiffs may also pursue in an appropriate forum any claim to recover specific funds that they believe have been unlawfully withheld.

III. At the least, the district court's universal injunction must be vacated as overbroad. The Supreme Court has recently made clear that the equitable powers of the federal courts are limited to providing relief to the parties in a particular case. Here, that limitation requires confining any injunction to the specific funding streams in which plaintiffs or their identified members have an interest. In nonetheless entering a much more sweeping injunction without any explanation regarding the injunction's scope, the district court erred.

## STANDARD OF REVIEW

This Court reviews "the district court's decision whether to grant" a preliminary injunction "for abuse of discretion," with the district court's legal conclusions reviewed de novo and its factual findings reviewed for clear

11

error. *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam) (quotation omitted).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet that burden at each step.

## I.    Plaintiffs Are Not Likely to Succeed on the Merits

### A.    Plaintiffs' Challenges to the Rescinded Memorandum Are Moot

At the outset, the district court erroneously concluded that plaintiffs' challenges to the Memorandum were not moot, even though OMB rescinded the Memorandum before the district court issued its preliminary injunction. *See* J.A. 330-31.

The OMB Memorandum directed federal agencies, where permitted by law, to freeze federal funding that might be affected by seven enumerated

12

Executive Orders pending a review to determine the best use of funds allocated to those programs.  Because that Memorandum was issued in the early days of the new Administration, and then rescinded a few days later, the district court could "do nothing to affect [plaintiffs'] rights relative to it, thus making this case classically moot for lack of a live controversy." *Akiachak Native Cmty. v. U.S. Dep't of the Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016); *see Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." (quotation omitted)).

In nonetheless concluding that the rescission did not moot plaintiffs' claims against the Memorandum, the district court held that the "doctrine of voluntary cessation" precluded a finding of mootness.  J.A. 330.  Under that doctrine, where a defendant voluntarily ceases the challenged practice, a plaintiff's claims will not be moot unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted).  This exception to mootness is designed to

13

prevent a defendant "from manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to return to his old ways." *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (quotation omitted).

The district court's determination that any controversy about the OMB Memorandum is not moot rests on the notion that OMB might once again direct federal agencies to freeze any federal funding that might be affected by the seven Executive Orders that were issued at the beginning of the new Administration while it conducts a review of the best use of those funds. That premise is illogical. A freeze pending such a review would necessarily happen only once, shortly after the Executive Orders were issued and before OMB had a chance to conduct its review.

Moreover, the particular legal issues addressed by the district court were specific to the circumstances in which the OMB Memorandum was issued. Plaintiffs cannot evade mootness by establishing that they "may be parties to the same sort of dispute in the future." *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 485 (8th Cir. 1998) (alteration and quotation omitted). Instead, "[t]o qualify for this exception," the defendant's future "conduct also must be sufficiently similar to the past conduct such that it is permissible to

14

say that the challenged conduct continues." *Corrigan v. Boston Univ.*, 98 F.4th 346, 353 (1st Cir. 2024) (alteration and quotation omitted).  But here, even if the government were in the future to pause some funding stream, any challenge to that pause would be substantially different from plaintiffs' challenges to the OMB Memorandum.

For example, plaintiffs' arbitrary-and-capricious claims turn on the specific features of the Memorandum—such as the particular explanation given in the Memorandum, the particular interests that OMB considered in issuing it, and even the specific implementation timeframe that it envisioned. *See infra* pp. 30-34.  But any future decision to pause funding would come with new explanation, new consideration, and a new timeframe.  Plaintiffs' factbound claims against the OMB Memorandum are unlikely to recur.

Nor was the district court correct to suggest—based on a social-media post from the White House Press Secretary making clear that the President's Executive Orders directing particular pauses in funding remained operative and on the fact that some of plaintiffs' members continued to be unable to access their funding—that the challenged conduct continued after the rescission.  *See* J.A. 330-31.  Of course, it is true that the OMB Memorandum's rescission did not affect the Executive Orders

15

themselves, and it may be that—because of those Executive Orders or otherwise—some agencies continued to freeze some funding even after the Memorandum was rescinded. But plaintiffs do not in this case challenge— and could not properly receive relief against—either the President's Executive Orders or any specific agency's decision to pause any specific funding stream. Thus, the rescission of the OMB Memorandum moots plaintiffs' claims, which are limited to challenging that Memorandum. And to the extent that plaintiffs continue—many months later—to be affected by the Executive Orders or by agency specific funding decisions, plaintiffs remain free to assert in a different suit whatever claims they may have against those decisions. But the possibility that plaintiffs might continue to be injured by conduct that falls outside the scope of the claims in this case cannot keep this suit alive.

Moreover, even if the district court were correct that the case was not moot shortly after the Memorandum was rescinded, the case is certainly moot now that many months have elapsed and the funding pauses at issue are largely a distant memory. Even allowing for the district court's concern that some federal agencies were still implementing some version of the Memorandum even after it was rescinded, any such implementation would

16

plainly have been overtaken by subsequent events such as new agency actions, new guidance, and other factors.

Finally, even if plaintiffs' claims against the OMB Memorandum were not altogether moot, their request for a preliminary injunction would be. *Cf. University of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) (explaining that "one issue in a case"—such as the "issue of preliminary injunctive relief"—may be moot even if "the case as a whole remains alive"). Because the "purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment," a preliminary-injunction request will be moot if there is no "reasonable possibility that" the challenged conduct will recur "while [the] case remains pending in the district court." *Ohio v. U.S. EPA*, 969 F.3d 306, 309 (6th Cir. 2020). By rescinding the Memorandum, the government has provided all that plaintiffs could hope to get from preliminary relief on their claims challenging the Memorandum. There is thus no way for a preliminary injunction against the Memorandum to "affect [plaintiffs'] rights relative to it." *Akiachak Native Cmty.*, 827 F.3d at 106. Of course, if any new funding pause were to be implemented, plaintiffs would be free to seek preliminary relief against that pause (even if pursuing such relief against a hypothetical

17

new agency action may require amending plaintiffs' complaint or filing an additional suit), ameliorating any possibility that plaintiffs' rights will be violated before final judgment.

### B.    The District Court Fundamentally Misunderstood the OMB Memorandum

1. The OMB Memorandum was an internal instruction to agencies to carry out the President's directions to temporarily pause certain federal funding—if agencies could lawfully do so—while the Executive Branch reviewed that funding for consistency with the President's priorities. Shortly after taking office, President Trump issued Executive Orders articulating policy views on several subjects and generally directed his subordinates in the Executive Branch to pause or terminate federal funding programs—to the extent consistent with applicable law—to ensure that those programs are consistent with the President's policy priorities. *See supra* p. 3. The OMB Memorandum expounded on those Executive Orders with additional internal directions to agencies.

The OMB Memorandum explained to agencies that, "[t]o implement these [Executive O]rders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the"

18

Executive Orders.  OMB Mem. 2; *see also* J.A. 62 (making clear that the Memorandum's directions were "expressly limited to programs, projects, and activities implicated by the [specified] Executive Orders").  The Memorandum directed agencies to "submit to OMB detailed information on any programs, projects or activities" implicated by the Executive Orders "[n]o later than February 10, 2025"—two weeks after the Memorandum was issued.  OMB Mem. 2.  The Memorandum contemplated that OMB would then "revie[w] and provid[e] guidance to" each "agency with respect to the information submitted."  *Id.*

In addition, pending that review, the Memorandum directed that "agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the" Executive Orders—but only "to the extent permissible under applicable law."  OMB Mem. 2 (emphasis omitted).  The Memorandum explained that this pause would "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities."  *Id.*  The Memorandum also directed agencies to "immediately identify any legally mandated actions or deadlines for assistance programs

19

arising while the pause remains in effect" and to "report this information to OMB along with an analysis of the requirement." *Id.*

To make the limitations on the Memorandum even clearer, OMB issued guidance the day after the Memorandum reiterating that "[a]ny payment required by law to be paid will be paid" and that the Memorandum "request[ed] that agencies temporarily pause" certain programs only "to the extent permitted by law." J.A. 62. OMB also categorically exempted not only those programs where payments were "required by law" but also "[a]ny program that provides direct benefits to individuals." *Id.* And the record reflects that OMB "worked with agencies" and "approved many programs to continue even before the pause" took effect. *Id.*

2. The crux of the district court's analysis was to interpret the OMB Memorandum in a manner irreconcilable with its plain text. In the court's view, the Memorandum required agencies to "freez[e] all federal financial assistance under open awards." J.A. 315; *see also, e.g.*, J.A. 343 (describing the Memorandum as "freez[ing] *all* federal financial assistance").

That erroneous understanding of the OMB Memorandum permeated the district court's analysis. In assessing mootness, the court emphasized that the Memorandum "was written, interpreted, and executed as a blanket

20

pause" and that this supposed "challenged conduct" continued even after the Memorandum's rescission. J.A. 331-32 (quotation omitted). And on the merits, the court concluded that OMB lacked authority "to halt all finances, full-stop, on a moment's notice" and to "unilaterally pull the plug on nearly all federal monetary flows," J.A. 345-46, as well as that OMB had offered no rational justification for "why they needed to freeze *all* federal financial assistance," J.A. 343.

The district court barely attempted to reconcile these characterizations with the clear meaning of the OMB Memorandum in context. Instead, to arrive at the view that the Memorandum directed the freezing of all federal financial assistance, the court engaged in an implausible parsing of the text of the Memorandum devoid of context. For example, when discussing the portion of the Memorandum directing agencies to "pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders," OMB Mem. 2 (emphasis omitted), the district court emphasized OMB's "decision to separate the first and second clauses" with a comma, *see* J.A. 332-33. In the district court's view, that placement of a comma reflected that OMB intended that the pause cover "all Federal financial assistance"—

21

including assistance unrelated to the covered Executive Orders—and,
separately, other activities "that may be implicated by the executive orders."
*See id.*

But in engaging in that analysis, the court failed to appreciate the
Memorandum's broader context; as the Memorandum made clear at the
beginning of the paragraph that the district court parsed, its purpose was
only to "implement" specific Executive Orders.  OMB Mem. 2.  Thus, the
Memorandum aimed its directions only at identifying funding "that may be
implicated by any of" those Orders.  *Id.*  Nor did the court properly
appreciate the other caveats and carveouts included in the Memorandum,
including that agencies could only implement the Memorandum "to the
extent permissible under applicable law."  *Id.*

And even if the district court's maximalist view of the OMB
Memorandum were reasonable in a vacuum, OMB's near-contemporaneous
guidance—issued the day after the Memorandum—makes clear the
limitations that the court refused to recognize.  Thus, OMB clarified
expressly that the Memorandum was "limited to programs, projects, and
activities implicated by the [specified] Executive Orders."  J.A. 62.  And
OMB reiterated various limitations on that (already limited) direction,

including that the pause was intended to be "temporar[y]," that it did not

apply to programs involving direct benefits to individuals or where payments

were required by law, and that agencies could receive exemptions for

additional programs on a case-by-case basis.  *See id.*

The district court did not dispute that OMB's guidance made expressly

clear that OMB intended the Memorandum to be limited in scope.  But

rather than properly interpret the OMB Memorandum in the context of that

guidance, the district court cast aside the guidance, concluding that it

"appears to contradict that of the original memorandum."  J.A. 339.  The

court thus remained firm in its view that the OMB Memorandum—contrary

to the guidance—"conveyed a clear directive to implement a blanket pause of

federal financial assistance."  J.A. 340.  But rather than disregarding OMB's

own guidance in an attempt to interpret the OMB Memorandum in a

maximalist—and, in the court's view, maximally unlawful—way, the district

court should have harmonized OMB's Memorandum and guidance, reading

them together to convey the limited direction intended.

Nor was the district court correct to suggest that the Memorandum

should be understood—and legally evaluated—as a direction for a blanket

freeze because some agencies suspended funding for programs that were

properly carved out of the Memorandum. *See* J.A. 340. Even if some agencies implemented funding freezes that—for whatever reason—went beyond the more limited freezes contemplated by the Memorandum, those agency actions cannot alter the plain meaning (or the legality) of the Memorandum itself. Of course, any argument that a particular agency acted inconsistent with governing law in freezing funds could be raised as a claim against that agency, but it cannot be shoehorned into a challenge to an OMB Memorandum that directed more limited actions. The "possibility that some agency might make a legally suspect decision" with regard to funding "does not justify an injunction against enforcement of a policy" that may be properly implemented in many circumstances. *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

## C.    The OMB Memorandum Was Lawful

Even before the OMB Memorandum was rescinded, plaintiffs' challenges to the Memorandum were unavailing because the Memorandum was plainly lawful. Properly understood, the Memorandum constituted the routine exercise of the President's authority to direct the Executive Branch. It was reasonable and reasonably explained. And its directions regarding federal funding do not implicate the First Amendment.

24

### 1.    OMB Had Statutory Authority to Issue the Memorandum

Properly understood, the OMB Memorandum constituted the routine exercise of the President's authority to direct the Executive Branch.  At the outset, there should be no dispute that the President may issue policy guidance to federal agencies, including in the form of Executive Orders that direct agency officials.  *See generally Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) (discussing how the President exercises his executive power by relying on subordinate officers subject to his direction).  As this Court has explained, the Constitution vests the President with "general administrative control of those executing the laws throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quotation omitted).  Thus, the President has inherent constitutional authority to "direc[t] his subordinates how to proceed" within other statutory constraints. *Id.* at 33.

The President may properly exercise this authority by instructing agencies generally to pause or terminate federal funding that does not accord with the President's policy priorities, to the extent agencies have authority to do so under governing law.  Federal agencies often have broad discretion to determine how to implement funding programs, including to terminate

funding based on policy preferences.  *See, e.g.*, 2 C.F.R. § 200.340(a)(4)

(authorizing terminations "to the extent authorized by law, if an award no

longer effectuates the program goals or agency priorities").  Because

agencies often can terminate funding awards for policy-based reasons, so too

may the President "control and supervise" agencies' decisions in this area.

*Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981).

Here, the President issued Executive Orders that direct federal

agencies to pause or terminate federal funding programs that may not

accord with the President's priorities where such action is consistent with

applicable law.  Those directives are plainly lawful, and the district court

properly did not conclude that they fell outside the President's inherent

authority to direct his subordinates.

Understood in that context, it is clear that the OMB Memorandum is

also lawful, because the Memorandum simply helps to implement the

President's Executive Orders by establishing a process for reviewing federal

funding and by directing agencies to pause funding—if consistent with

applicable law—pending that review.

There should be no dispute that OMB is entitled to issue guidance

regarding implementation of the President's funding directives.  As the

district court correctly recognized, *see* J.A. 345, OMB is statutorily authorized to provide "overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements," 31 U.S.C. § 503(a)(2).  Thus, to the extent that statutory authority is required to issue internal-facing guidance, OMB is clearly authorized to issue guidance regarding the management of budgetary matters.

Indeed, OMB is particularly well situated to issue Executive Branch-wide guidance regarding implementation of the President's funding-related directives, given not only OMB's expertise in financial management but also the office's close connection to the President.  OMB is itself an office within the Executive Office of the President.  31 U.S.C. § 501.  And as this Court has recognized, the "OMB Director, whose duties include aiding the President in managing the entire executive branch," is "the cabinet officer functionally, if not actually, closest to the President."  *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993); *see also, e.g.*, *Public Citizen, Inc. v. OMB*, 598 F.3d 865, 867 (D.C. Cir. 2010) (explaining that one of OMB's roles is to "ensur[e]" that "policies prepared by other federal agencies are consistent with Administration policy").

27

Given OMB's unique role within the Executive Branch, it is no surprise that Presidents routinely enlist OMB's help in implementing financial directives similar to those contained in the Executive Orders here.  Thus, for example, when President Biden issued a Proclamation directing agencies to temporarily pause "the obligation of funds related to construction of the southern border wall" pending a review of that funding, he also directed the relevant agencies to coordinate with the Director of OMB regarding both the pause in funding and the development of a new plan to redirect funding. Proclamation No. 10,142, §§ 1(a), 2, 86 Fed. Reg. 7225, 7225-26 (Jan. 20, 2021) (published Jan. 27, 2021).  Similarly, when President Obama directed agencies to delay certain funding to "ensure adequate opportunity for public scrutiny," he also directed those agencies to "consult immediately with [OMB]" about the relevant legal requirements. *Ensuring Responsible Spending of Recovery Act Funds* § 2(d), 74 Fed. Reg. 12,531, 12,532 (Mar. 20, 2009) (published Mar. 25, 2009).  In implementing the Executive Orders here through the OMB Memorandum, OMB was similarly acting within its traditional role of supervising and guiding agency funding determinations to ensure compliance with the President's directives.

28

In nonetheless concluding that OMB lacked authority to issue the Memorandum, the district court did not suggest that the President lacked authority to direct agencies to pause funding where legally permissible. Nor did the court dispute that OMB has statutory authority to "provid[e] overall direction and establis[h] financial management policies" for the Executive Branch. J.A. 345-46. But, the court stated, that authority does not permit OMB to "halt all finances, full-stop, on a moment's notice." *Id.* In reaching that conclusion, the court failed to appreciate that the underlying Executive Orders direct agencies to halt covered funding streams where lawful; the OMB Memorandum implements—but is not the underlying source of—that direction. And against the backdrop of the President's directives, it is clear that OMB was properly acting in its "supervisory" role, J.A. 346, when it issued the Memorandum to guide agencies' implementation of those directives.

Nor did the district court advance the ball by citing principles of the major-questions doctrine. *See* J.A. 346-47. For one, the President's and OMB's authority in this space is clear, which renders those principles irrelevant. Regardless, the major-questions doctrine addresses the concern of "*agencies* asserting highly consequential power beyond what Congress

29

could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added).  That concern dissipates where (as here) the relevant substantial authority is exercised by the President—"the most democratic and politically accountable official in Government." *Seila Law LLC*, 591 U.S. at 224.  Moreover, the directives at issue here relate to the President's internal management of the Executive Branch, not to any attempt to regulate or bind members of the public.  That is not an exercise of regulatory authority at all and thus does not raise major-questions concerns. *Cf. Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 726 (10th Cir. 2024).

### 2. The OMB Memorandum Was Reasonable and Reasonably Explained

Plaintiffs' arbitrary-and-capricious challenge provides no basis for upholding the district court's injunction.  At the outset, it bears repeating that because the Memorandum has been rescinded, plaintiffs may continue to advance their arbitrary-and-capricious claim only if the particular controversy raised by that claim is likely to recur.  That would require not only that OMB issue a similar memorandum in the future, but that it do so under similar circumstances and for the same reasons.  Even if this Court does not regard other aspects of this appeal as moot, that circumstance is sufficiently unlikely that this claim is moot.

30

In any event, the OMB Memorandum was not arbitrary and capricious. That "standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

The OMB Memorandum plainly met that standard. The Memorandum explained that its objective was to effectuate the President's Executive Orders and "safeguard valuable taxpayer resources." OMB Mem. 1. To advance that objective, the Memorandum directed agencies to assess which funding programs may be implicated by the Executive Orders and to freeze funding—where legally permissible—for those programs pending additional review. *Id.* at 2. The connection between the Memorandum's objective and its directions was plain: because substantial federal funds are spent every day—more than "$3 trillion" in federal funds "such as grants and loans" are expended annually, *id.* at 1—the pause contemplated by the Memorandum was necessary to minimize the expenditure of funds inconsistent with the Administration's policy priorities while the Administration reviewed funding.

At the same time, the OMB Memorandum took steps to ameliorate any negative effects, exempting not only payments required by law but also any

31

"assistance received directly by individuals."  OMB Mem. 1 n.1.  And the Memorandum permitted agencies to request additional exceptions "on a case-by-case basis."  *Id.* at 2.  The record thus reflects that OMB "worked with agencies" to "approv[e] many programs to continue."  J.A. 62.  That calibrated approach—particularly in the context of a temporary pause designed to ensure that funding is consistent with the President's priorities—satisfied the APA's standard.

In concluding otherwise, the district court stated that OMB had not reasonably explained the need to "freeze *all* federal financial assistance in less than a day" and had not engaged in "any consideration [of] the consequences of that decision."  J.A. 343-44 (quotation omitted).  But that characterization is incorrect on all levels.  As explained, the OMB Memorandum did not contemplate a freeze of "all federal financial assistance" but instead applied only to certain funding programs related to specific Executive Orders.  Regardless, the Memorandum expressly considered the consequences of the pause while providing carve-outs for mandatory payments and direct assistance to individuals.

Even beyond its categorical carve-outs, the Memorandum provided for agencies to request exceptions as warranted for specific programs.  That

case-by-case approach was particularly reasonable in this context, where the Memorandum's instructions would be implemented by many agencies across a wide variety of programs. Those agencies are best positioned to evaluate the practical consequences of pausing funding in each circumstance and to coordinate with OMB where exceptions are warranted by those consequences. Although the district court was concerned that the OMB Memorandum did not leave sufficient time for agencies to make those evaluations, J.A. 344, the need to make evaluations across different programs only underscores the reasonableness of OMB's choice to have agencies—not the OMB Memorandum itself—undertake those evaluations in the first instance, as the agencies did in conjunction with OMB "even before the pause" took effect, J.A. 62.

The district court was also wrong to conclude that the OMB Memorandum ignored funding recipients' reliance interests. *See* J.A. 344. The Memorandum contemplated that funds would continue being disbursed in circumstances where reliance interests would be most acute, including for direct assistance to individuals, payments required by law, and payments that agencies believed appropriate to continue on a case-by-case basis. *See supra* pp. 31-32. Although the district court may have believed that those

33

exceptions do not adequately protect reliance interests in programs subject to the pause, the Memorandum undertook to balance the important government interests against the need to continue funding certain programs. And the Memorandum left agencies to take any legitimate reliance interests into account in individual circumstances. That is precisely the sort of reasoned decisionmaking required by the APA.

### 3. The OMB Memorandum Did Not Violate the First Amendment

Plaintiffs' First Amendment claims are meritless because the government is permitted to decide which activities it wishes to subsidize. The district court did not go so far as to conclude that plaintiffs are likely to succeed on this claim but instead expressed a provisional view that the government's actions "could raise First Amendment concerns" and that plaintiffs "have shown some likelihood of success." J.A. 348. In reaching that tentative conclusion and in entering a universal injunction, the court fundamentally misapplied the governing legal principles.

The Supreme Court has long made clear that the First Amendment provides the government significant flexibility when it acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate speech. The "decision not to subsidize the exercise of a fundamental right does not

34

infringe the right," *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983), and "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).  The government "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998), and may "cho[ose] to fund one activity to the exclusion of the other," *Rust*, 500 U.S. at 193.

Thus, the government can permissibly refrain from funding abortions, *Harris v. McRae*, 448 U.S. 297, 315 (1980), from subsidizing government lobbying, *Regan*, 461 U.S. at 550, and from subsidizing striking employees, *Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 371 (1988).  In this case, the government was no less entitled to cease "[t]he use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies" that the government considers to be "a waste of taxpayer dollars."  OMB Mem. 1. The government determined that federal financial assistance should instead "be dedicated to advancing Administration priorities," such as by "focusing

35

taxpayer dollars to advance a stronger and safer America" and by "unleashing American energy and manufacturing." *Id.*

The district court acknowledged that "refusing to pay for certain speech generally does not inflict a First Amendment harm," J.A. 347, but nonetheless suggested that the "calculus could change if individuals or organizations have already been awarded certain funds and grants," J.A. 348. Although the court gestured to rulings regarding due process, *see id.* (citing *J.D. v. Azar*, 925 F.3d 1291, 1327 (D.C. Cir. 2019) (per curiam)), it did not explain how that distinction has any bearing on the First Amendment analysis. When acting within its discretion to decide which activities to "selectively fund," the government may, consistent with the First Amendment, redirect funds from activities that do not advance its policy objectives to activities that do. *See Rust*, 500 U.S. at 193-94 (rejecting the notion that "the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals" even if "advancing those goals necessarily discourages alternative goals").

The district court likewise erred in suggesting that the government sought "to leverage funding to regulate speech outside the contours of the

program itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205, 214-15 (2013). Such an unconstitutional condition may arise
when a recipient is required to agree to refrain from engaging in expressive
conduct "separate and independent from the project that receives [federal]
funds." *Rust*, 500 U.S. at 196. Here, by contrast, the OMB Memorandum
contemplated a pause to determine the proper allocation of federal funds
within the confines of each federal program. By its terms, the
Memorandum's directives were framed around "focusing taxpayer dollars"
and "[t]he use of Federal resources." OMB Mem. 1-2. Nor was there any
evidence that the government "target[ed] specific recipients *because* they
associate with certain ideas." J.A. 349. The Memorandum directed a review
of how federal funds were being spent, and it in no way prevented plaintiffs
and other recipients from using non-federal funds to engage in whatever
protected expression they desire.

The district court's universal injunction is even more objectionable
because it is not tailored to any supposed "First Amendment concerns." J.A.
348. For example, the injunction sweeps in grant funds received by one of
plaintiffs' members to develop an "ultra-compact" neutron generator that
can be used for detecting "explosives, hazardous chemicals, and special

37

nuclear material." J.A. 221. It is hard to see how a pause on such funding has any relation to expressive activity. And the district court performed no individualized assessment about how the contemplated pause would affect protected expression with respect to all plaintiffs and all their members, not to mention every recipient with an open federal award. Even if some recipient had a cognizable objection under specific circumstances, that claim would not justify the broad relief entered by the court.

## II.    The Equitable Factors Do Not Support a Preliminary Injunction

Because plaintiffs have demonstrated no likelihood of success on the merits, this Court need not consider the remaining preliminary injunction factors. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) ("Without such a substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." (quotation omitted)). However, plaintiffs likewise failed to establish that these factors favor relief.

The balance of harms and public interest weigh against a preliminary injunction. *See Nken*, 556 U.S. at 435 (noting that these factors merge in cases involving the government). The injunction here interferes with OMB's

38

ability to oversee the implementation of the President's policy directives in budgetary matters. The injunction thus works to undermine the President's unquestioned Article II authority to direct subordinate agencies how to exercise their own authorities, giving rise to an intolerable intrusion on the prerogatives of the Executive Branch.

The preliminary injunction's opaque instructions exacerbate these harms. The district court enjoined the government defendants from "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in" the rescinded OMB Memorandum. J.A. 354. Although OMB has never suggested that it will reissue the Memorandum or issue any materially similar memorandum, the prohibitions on "giving effect to" the "directives in" the Memorandum and on "reinstating" them "under a different name" provide an opening to challenge future actions by OMB whenever plaintiffs or the court believe that those actions too closely resemble the Memorandum in some unspecified way. The injunction's nebulous language thus lacks the requisite precision about the specific "act or acts restrained." Fed. R. Civ. P. 65(d)(1)(C). If nothing else, the prospect of contempt proceedings threatens to chill OMB from taking legally permitted actions to issue guidance regarding funding priorities. And

the district court's conclusion that the case was not moot because the challenged conduct could recur reinforces the prospect that the district court had an unduly broad view of what sort of conduct might be similar to the conduct challenged here.

To the extent the district court's injunction could plausibly affect some future directive to pause funding, the court ignored the grave harms to the government and the public that cannot be unwound. In ordering "agencies to continue releasing any disbursements on open awards that were paused," J.A. 354, based on "the public's interest in not having trillions of dollars arbitrarily frozen," J.A. 351, the court entirely failed to account for the government's and public's countervailing interests in protecting the public fisc. If a pause of this kind is preliminarily enjoined but the government's position is later vindicated, there would be no guarantee that funds disbursed pursuant to the district court's order could "be recouped" after the fact. *National Insts. of Health v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (quotation omitted); *see Department of Educ. v. California*, 604 U.S. 650, 651-52 (2025) (same) (per curiam). Particularly when the district court declined to impose a bond, J.A. 352, the government lacks adequate assurance about recovery. *See* Fed. R. Civ. P. 65(c) ("The court may issue a

40

preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). There is no sound basis to compel the government to take actions that the President considers "a waste of taxpayer dollars that d[o] not improve the day-to-day lives of those we serve." OMB Mem. 1.

These irreversible harms far outweigh any asserted harms to plaintiffs. As a preliminary matter, the district court was wrong to rely on claimed injuries to some of plaintiffs' members, *see* J.A. 350, as the basis to issue an injunction covering all plaintiffs and all their members, much less every recipient of an open federal award. In any event, the identified harms do not justify an injunction at all. Those harms stem from the government's alleged failure to timely pay money. *See id.* But plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. If plaintiffs are legally entitled to specific funds on a specific timeline, they may bring claims related to those specific funds in "an appropriate forum" and, "if [they] ultimately prevail," may receive funds to which they are entitled. *California*, 604 U.S. at 652; *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir.

41

2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (alteration and quotation omitted)).  Such monetary harms do not support an injunction circumscribing OMB's authority to manage the government's financial affairs.

## III.    The District Court's Universal Injunction Was Overbroad

The district court's injunction prohibits defendants from implementing or reinstating the OMB Memorandum "with respect to the disbursement of Federal funds under all open awards," J.A. 354—rather than only as to those awards made to plaintiffs.  Even if the court correctly granted a preliminary injunction to plaintiffs, that universal injunction is overbroad and must be vacated in part.

1.  The Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which was handed down after the district court's preliminary-injunction ruling, makes clear that universal relief was improper.  As the Court explained, Congress "has granted federal courts no" power to issue such "universal injunction[s]."  *Id.* at 841.  Instead, consistent with the longstanding limits on equitable power that cabin the authority provided to federal courts in the Judiciary Act of 1789, federal courts sitting in equity

42

may provide—at most—"complete relief *between the parties*." *Id.* at 851 (quotation omitted). That principle required the district court to limit its injunction to the specific funding streams that plaintiffs themselves have been awarded.

In nonetheless entering a universal injunction, the district court did not conclude that such sweeping relief was necessary to provide plaintiffs with complete relief. To the contrary, the court did not address the proper scope of its relief at all, instead entering universal relief with no explanation. *But see* J.A. 314 (government arguing in district court that relief had to be limited to "awards involving the identified Plaintiffs"). That was erroneous.

Nor did the district court properly support its universal relief by referring, in its injunction, to two provisions of the APA, 5 U.S.C. §§ 705 and 706. *See* J.A. 355. As an initial matter, although the court obliquely stated that its injunction "shall apply to the maximum extent provided for" by those provisions, *id.*, the court nowhere explained how those provisions support the entry of a universal injunction, either generally or in this case. They thus could provide no basis for affirming the court's overbroad injunction.

Regardless, even if the district court had expressly invoked those APA provisions as support for the universal relief it entered, those provisions

43

cannot bear that weight.  Although the Supreme Court in *CASA* expressly did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action," 606 U.S. at 847 n.10 (citing 5 U.S.C. § 706(2), which authorizes courts to "hold unlawful and set aside agency action"), that question has no relevance here. As the Fifth Circuit has explained, a "vacatur does nothing but re-establish the status quo absent the unlawful agency action" and—unlike an injunction—"neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (per curiam).

In entering preliminary injunctive relief, the district court did not purport to be—and was not in fact—exercising whatever authority the APA may provide to courts.  Instead, the court entered interlocutory relief that both compels and restrains, on pain of contempt, future agency decisionmaking.  The only power the court could have to enter such a preliminary injunction is the equitable authority provided in the Judiciary Act of 1789.  *See CASA*, 606 U.S. at 841 ("The Judiciary Act of 1789 endowed federal courts with jurisdiction over all suits in equity, and still today, this statute is what authorizes the federal courts to issue equitable remedies."

44

(alteration, citation, and quotation omitted)). And as *CASA* makes clear, that authority does not support the entry of universal relief.

Nor could the district court's universal injunction be properly justified as an exercise of the authority that the APA provides courts to issue—"to the extent necessary to prevent irreparable injury"—"all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of" judicial review. 5 U.S.C. § 705.

For one, the district court court's interlocutory relief (again, a preliminary injunction backed by the threat of contempt) goes beyond the limited postponement authority contemplated by § 705. Regardless, § 705 provides no avenue around the equitable limitations on non-party relief identified in *CASA*. That provision permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which incorporates constitutional and equitable limitations on non-party relief. Indeed, the legislative history makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not

45

always, be limited to the parties complainant." *Id.* More generally, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Thus, consistent with the equitable principles articulated in *CASA*, the APA requires courts to decline to enter universal relief, however styled, where other remedies would fully redress plaintiffs' injuries.

2. For similar reasons, appropriately tailored relief would not run to the unidentified members of the National Council of Nonprofits, the American Public Health Association, or the Main Street Alliance, each of which asserts that it is an "organization" or "network" with tens of thousands of members. *See* J.A. 15 (alleging that the National Council of Nonprofits is a "network of nonprofit organizations" with "more than 30,000 organizational members"); J.A. 15-16 (alleging that the American Public Health Association is a nonprofit organization that "represents more than 23,000 individual members" and has "52 state and regional affiliates"); J.A. 16 (alleging that the Main Street Alliance is a "network of small businesses, which represents approximately 30,000 small businesses across the United States").

Here, the associational plaintiffs submitted declarations relating to a handful of members who assertedly have standing to challenge the

46

government's actions.  Plaintiffs cannot properly leverage those declarations into a mandate to seek relief on behalf of tens of thousands of other unidentified funding recipients.

As an initial matter, plaintiffs have not properly demonstrated that they have standing to litigate on behalf of their members as a whole, because they have not shown that they are a bona fide membership organization. They have not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor have they explained how their members direct or control the organizations. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted).

To the contrary, plaintiffs' assertion that each association has tens of thousands of members suggests that plaintiffs are diffuse organizations whose purported members have no substantial ability to exercise any oversight or control of the organizations.  Nothing in the record suggests that the organization's members control—or are even aware of—this litigation that is purportedly on their behalf or that these members understand that they may be bound by an adverse judgment on their claims.

47

In these circumstances, plaintiffs may not properly pursue relief on behalf of all of their identified members.

Regardless, even if plaintiffs could satisfy Article III's requirements to advance claims on behalf of all their members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment.  As the Supreme Court explained in *CASA*, the appropriate avenue for pursuing relief on behalf of others similarly situated is a class action suit under Federal Rule of Civil Procedure 23, which includes substantial "procedural protections" for the benefit of both the plaintiffs (including members of the class who will be bound by any adverse judgment) and the defendants.  606 U.S. at 849-50. Permitting three organizational plaintiffs to proceed on behalf of many tens of thousands of unidentified funding recipients improperly "circumvent[s]" those limits, *id.*, and undermines longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional, *cf. Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

48

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated or reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

September 2025

49

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9534 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
Sean R. Janda