# In the United States Court of Appeals for the District of Columbia Circuit

---

NATIONAL COUNCIL OF NONPROFITS, ET AL.,

*Plaintiffs-Appellees,*

v.

OFFICE OF MANAGEMENT AND BUDGET, ET AL.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-239 (LLA)

---

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

---

Jessica Anne Morton
Kevin E. Friedl
Robin F. Thurston
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE AS TO PARTIES,
# RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies the following:

## A.    Parties and Amici

Plaintiffs in the district court, and appellees here, are National Council of Nonprofits, American Public Health Association, Main Street Alliance, and SAGE.

National Council of Nonprofits is a network of nonprofit organizations with more than 30,000 organizational members, and is itself a 501(c)(3) organization. National Council of Nonprofits certifies that it does not have parent corporations and that no publicly held corporation has a 10% or greater ownership interest in National Council of Nonprofits.

American Public Health Association is a 501(c)(3) nonprofit membership organization that, among other things, strengthens the profession of public health and advocates for public health issues and policies grounded in scientific research. American Public Health Association certifies that it does not have parent corporations and that

no publicly held corporation has a 10% or greater ownership interest in American Public Health Association.

Main Street Alliance is a national network of small businesses representing approximately 30,000 small businesses across the United States, and is a 501(c)(3) organization. Main Street Alliance certifies that it does not have parent corporations and that no publicly held corporation has a 10% or greater ownership interest in Main Street Alliance.

SAGE is a 501(c)(3) nonprofit organization dedicated to improving the lives of lesbian, gay, bisexual, and transgender adults. SAGE certifies that it does not have parent corporations and that no publicly held corporation has a 10% or greater ownership interest in SAGE.

Defendants in the district court, and appellants here, are the Office of Management and Budget and Russell Vought, in his official capacity as Director of OMB. (The case was originally filed against Matthew Vaeth, in his official capacity as Acting Director; he was automatically substituted by Director Vought.) In both the district court and this Court, the American Center for Law and Justice filed an amicus brief in support of the defendants (and later, appellants). In the district court, Beatrice Adams moved to intervene in support of defendants; that motion was

denied. There were no other parties, intervenors, or amici before the district court, and no other intervenors or amici have appeared in this Court to date.

## B.    Ruling Under Review

The appellants seek review of the February 25, 2025 Memorandum Opinion and Order issued by the Honorable Loren L. AliKhan in *National Council of Nonprofits* v. *Office of Management & Budget*, Case No. 25-239 (D.D.C.), at Dkt. Nos. 51 and 52, respectively. The Memorandum Opinion has been reproduced at JA 315–53 and the Order has been reproduced at JA 354–55. The Memorandum Opinion has been published at 775 F. Supp. 3d 100 (D.D.C. 2025).

## C.    Related Cases

This case has not previously been before this Court or any other court (other than the district court below). Undersigned counsel is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Dated:  December 19, 2025         Respectfully submitted,

                                                  */s/ Jessica Anne Morton*
                                                  Jessica Anne Morton
                                                  Kevin E. Friedl
                                                  Robin F. Thurston
                                                  Democracy Forward Foundation
                                                  P.O. Box 34553

Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
rthurston@democracyforward.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... vii

GLOSSARY............................................................................................. xi

INTRODUCTION.................................................................................... 1

JURISDICTIONAL STATEMENT......................................................... 2

STATEMENT OF ISSUES .................................................................... 2

STATEMENT OF THE CASE ............................................................... 3

    A.    The Freeze Order commands a near immediate halt to
        federal financial assistance ...................................................... 3

    B.    Plaintiffs swiftly challenge the unlawful Freeze Order
        and the district court enters an administrative stay............. 6

    C.    OMB purports to "rescind" the Freeze Order, but
        implementation continues ........................................................ 7

    D.    The court enters a temporary restraining order ................... 9

    E.    The court enters a 705 stay and preliminary injunction ..... 10

SUMMARY OF ARGUMENT................................................................ 17

STANDARD OF REVIEW .................................................................... 18

ARGUMENT......................................................................................... 19

I.    The district court properly construed the Freeze Order ............... 19

II.    The nonprofits are likely to succeed on the merits ...................... 28

    A.    The Freeze Order is arbitrary and capricious...................... 29

    B.    The Freeze Order was issued without statutory
        authority................................................................................. 38

    C.    This case was not moot when the preliminary
        injunction was issued and is not moot now .......................... 42

III.    The nonprofits amply demonstrated irreparable injury and
        the public interest favors affirmance ............................................ 49

IV.   The remedy ordered was consistent with APA principles and
      well within the district court's discretion ...................................... 53

CONCLUSION ........................................................................... 61

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Nebraska,*
  600 U.S. 477 (2023) .............................................................. 41

*Bldg. & Constr. Trades Dep't v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ................................................ 28

*Carson v. Am. Brands, Inc.,*
  450 U.S. 79 (1981) ................................................................. 2

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................. 28

*City of Salisbury, N. Carolina v. FERC,*
  36 F.4th 1164 (D.C. Cir. 2022) ........................................... 23

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024) .............................................................. 55

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) .............................................................. 28

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) .................................................. 29, 30, 36

*Doe v. SEC,*
  28 F.4th 1306 (D.C. Cir. 2022) ........................................... 47

*Doe v. Trump,*
  142 F.4th 109 (1st Cir. 2025) ............................................. 60

*FBI v. Fikre,*
  601 U.S. 234 (2024) .......................................... 42, 43, 45, 46

*Flynn v. CIR,*
  269 F.3d 1064 (D.C. Cir. 2001) ................................... 50, 59

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r*
  *of Internal Revenue Serv.,* 926 F.3d 819 (D.C. Cir. 2019) .................... 23

*Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB,*
61 F.4th 169 (D.C. Cir. 2023) ................................................ 36

*League of Women Voters of the U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ............................................. 50, 52

*Lockhart v. United States,* 577 U.S. 347 (2016) .................................... 23

*Make the Road New York v. Noem,*
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ............................ 2, 55, 56

*Marin Audubon Soc'y v. FAA,*
121 F.4th 902 (D.C. Cir. 2024) ............................................ 40

*Media Matters for Am. v. Paxton,*
138 F.4th 563 (D.C. Cir. 2025) ....................................... 19, 52

*Michigan v. EPA,*
576 U.S. 743 (2015) ....................................................... 38

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.,* 463 U.S. 29 (1983) .................................... 31, 37

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025) .............................................. 58

*New York v. Trump,*
764 F. Supp. 3d 46 (D.R.I. 2025) ......................................... 13

*Ohio v. EPA,*
603 U.S. 279 (2024) ......................................... 19, 29, 30, 38

*Peabody Midwest Mining, LLC v. Mine Safety & Health Admin.,*
70 F.4th 602 (D.C. Cir. 2023) ............................................. 26

*Public Citizen, Inc. v. FERC,*
92 F.4th 1124 (D.C. Cir. 2024) ....................................... 43, 44

*Reps. Comm. for Freedom of the Press v. Rokita,*
147 F.4th 720 (7th Cir. 2025) ............................................. 60

*Se. Ala. Med. Ctr. v. Sebelius*,
  572 F.3d 912 (D.C. Cir. 2009)............................................... 41

*Spirit Airlines, Inc. v. Dep't of Trans.*,
  997 F.3d 1247 (D.C. Cir. 2021)............................................ 37

*Students for Fair Admissions, Inc. v. President & Fellows of*
  *Harvard Coll.*, 600 U.S. 181 (2023) ............................... 59, 60

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994)............................................................ 26

*Trump v. CASA*,
  606 U.S. 831 (2025)..................................... 53, 55, 56, 57, 60

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009).................................... 57, 58

*Vasquez Perdomo v. Noem*,
  148 F.4th 656 (9th Cir. 2025)............................................. 56

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)............................................ 50

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986)............................................ 37

**Statutes**

5 U.S.C § 551(4) ...................................................................... 26

5 U.S.C § 705 ..................................... 2, 16, 53, 54, 55, 56, 60

5 U.S.C § 706 ....................................................... 16, 53, 54

28 U.S.C. § 1292(a)(1)............................................................. 2

28 U.S.C. § 1331 ..................................................................... 2

31 U.S.C. § 503(a)(2)............................................................. 39

**Regulation**

2 C.F.R. § 200.1.................................................................... 32

**Other Authorities**

Ashley Parker, *The Memo That Shocked the White House*,
   The Atlantic (Jan. 29, 2025).................................................. 40

Exec. Order No. 14,151,
   90 Fed. Reg. 8339 (Jan. 20, 2025) ........................................ 4

Exec. Order No. 14,169,
   90 Fed. Reg. 8619 (Jan. 20, 2025) ........................................ 4

Jeff Stein et al., *White House pauses all federal grants, sparking
   confusion*, Washington Post (Jan. 28, 2025) ........................ 25

Jonathan Swan & Zolan Kanno-Youngs, *Inside the Chaotic Rollout
   of Trump's Federal Funding Freeze*, N.Y. Times (Jan. 29, 2025)........ 40

Kelsey Tamborrino et al., *Trump's spending freeze spreads chaos
   across US*, Politico (Jan. 28, 2025)...................................... 25

OMB Memorandum M-25-13, *Temporary Pause of Agency Grant,
   Loan, and Other Financial Assistance Programs*
   (Jan. 27, 2025),............................. 4, 5, 6, 20, 21, 24, 31, 32, 33

Russ Vought (@russvought), X (Oct. 1, 2025, 9:54 AM), ........................ 47

Russ Vought (@russvought), X (Oct. 3, 2025, 7:29 AM), ........................ 46

Russ Vought (@russvought), X (Oct. 17, 2025, 2:24 PM)........................ 46

# GLOSSARY

APA                          Administrative Procedure Act

OMB                          Office of Management and Budget

**INTRODUCTION**

In January 2025, the Office of Management and Budget and its Acting Director halted, overnight, the flow of trillions of dollars in federal financial assistance to thousands of nonprofits, small businesses, state agencies, tribes, and municipalities across the country. These funds provide vital services and benefits to the public, ranging from disaster relief, to medical research, to care for people who are sick or have disabilities, to programs for small children, to services for the elderly. OMB imperiled these funding recipients and the communities they serve without notice, cause, or cogent explanation, causing, in the words of the district court, "nationwide panic" and "widespread chaos" with "catastrophic effects." JA 321, 343.

The government now seeks to minimize these impacts, claiming that OMB's unprecedented Freeze Order was "routine," Br. at 2, that it was quickly rescinded, and that the resulting harms were "relatively minimal," Br. at 11. This revisionist history ignores the thorough record of harm and dysfunction the district court considered before entering preliminary relief and identifies no contrary evidence that could demonstrate an abuse of discretion by the court. The government's legal

arguments are no more persuasive and largely rely on an implausible effort to rewrite the Freeze Order's direction to agencies. In short, the government offers no basis on which to conclude that the district court abused its discretion in determining that each factor weighed in favor of applying the appropriate remedy in this Administrative Procedure Act case: preliminarily halting the Freeze Order. The Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It entered an order for preliminary relief on February 25, 2025. JA 315–55. Defendants timely appealed on April 24. JA 356. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). *See Make the Road New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *8 (D.C. Cir. Nov. 22, 2025) (statement of Millett and Childs, JJ.) (concluding that the Court likely had jurisdiction over appeal from section 705 stay); *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83–84 (1981).

## STATEMENT OF ISSUES

1. In January 2025, OMB ordered federal agencies to halt payment on nearly all open awards of federal financial assistance, indefinitely and on roughly twenty-four hours' notice. Did the district

court err in concluding that OMB's directive was likely arbitrary and capricious and beyond that agency's statutory authority?

2.    After Plaintiffs brought suit, OMB purported to rescind its directive, but agencies continued to carry out that directive and the administration announced that the freeze remained in effect.  Did the court abuse its discretion in finding that the case was not moot?

3.    OMB's directive sowed chaos nationwide and threatened countless providers of vital services, including health and emergency services, as well as the recipients of those services, with imminent and irreparable harm.  Did the court abuse its discretion in concluding that the equities favored preliminary relief?

4.    The court ordered preliminary relief to preserve the status quo and temporarily deprive the challenged agency action of force and effect. Was that remedy unavailable under the Administrative Procedure Act?

## STATEMENT OF THE CASE

### A.    The Freeze Order commands a near immediate halt to federal financial assistance.

Shortly after taking office, President Trump issued several executive orders announcing his administration's priorities.  Some, but

not all, of these orders directed agencies to take steps to review, and in some instances halt, federal funding in certain specific areas.  *See* Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) (directing agencies to "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts" within sixty days); Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619, 8619 (Jan. 20, 2025) (directing agencies to "immediately pause new obligations and disbursements of development assistance funds").

On January 27, 2025, OMB issued a "Memorandum for Heads of Executive Departments and Agencies," numbered M-25-13 and titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs."  This Freeze Order states that in the last fiscal year, the United States spent more than $3 trillion on federal financial assistance programs such as grants and loans.   OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://perma.cc/BH3G-PM8Y [Freeze Order] at 1, Add. 1.  It warns that these programs "should be

dedicated to advancing Administration priorities" such as "ending 'wokeness'" and should not be used "to advance Marxist equity, transgenderism, and green new deal social engineering." *Id.*

To that end, the Order commands agencies to take certain steps. It "requires" them "to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," citing seven executive orders. *Id.* at 1–2 (footnotes omitted). The Order defines the scope of relevant "federal financial assistance" as "all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1" and "assistance received or administered by recipients or subrecipients of any type"— excluding only "assistance provided directly to individuals," Medicare, and Social Security benefits. *Id.* at 1 nn.1–2.

The Order then states:

> In the interim [i.e., while agencies are reviewing spending for consistency with the President's policies], to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations,

> DEI, woke gender ideology, and the green new
> deal.

*Id.* at 2 (emphasis in original). The Order reiterates several times the broad requirement to halt all obligations and disbursements. It requires that "[e]ach agency must pause," among other things, "issuance of new awards" and "disbursement of Federal funds under all open awards." *Id.* It "directs Federal agencies to pause all activities associated with open NOFOs [notices of funding opportunity]." *Id.* And it emphasizes that exceptions will be determined by OMB—not the agencies themselves— "on a case-by-case basis." *Id.* The Order provides that "[t]he temporary pause will become effective on January 28, 2025, at 5:00 PM"—the very next day. *Id.*

## B. Plaintiffs swiftly challenge the unlawful Freeze Order and the district court enters an administrative stay.

Around noon on January 28, the National Council of Nonprofits, American Public Health Association, Main Street Alliance, and SAGE filed suit. These nonprofits—associations of organizations and individuals that receive federal financial assistance, or recipients themselves—alleged that the Freeze Order is invalid and unlawful under the Administrative Procedure Act because it is arbitrary and capricious, in excess of statutory authority, and contrary to the First Amendment.

The nonprofits immediately sought a temporary restraining order to enjoin OMB from implementing or enforcing the Order.

Minutes before the Freeze Order was set to take effect, the district court entered an administrative stay pausing the Order with respect to open awards of federal financial assistance. The court explained that it did so to "maintain the status quo [with respect to open grants] until the court may rule on Plaintiffs' motion," and in response to the government's suggestion that additional time was needed for briefing and full consideration of the relevant legal issues. JA 67. The order made clear that the court had acted to "block[] executive action" by temporarily halting the "direction that agencies 'pause . . . disbursement of Federal funds under all open awards.'" *Id.* (citation omitted).

## C. OMB purports to "rescind" the Freeze Order, but implementation continues.

The following day—in response to this suit and the administrative stay—OMB purported to rescind the Freeze Order through the issuance of a new memorandum, M-25-14. *See* JA 69. That memo states: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your

agency General Counsel." *Id.* That purported rescission was subsequently widely reported on in the press.

Shortly after Memo M-25-14 was publicized, White House Press Secretary Karoline Leavitt announced on social media that the purported "rescission" of the federal funding freeze was, in fact, "NOT a rescission of the federal funding freeze":



*See* JA 319. The Press Secretary explained that Memo M-25-14 had issued specifically "[t]o end any confusion created by the court's injunction." *Id.*

The Press Secretary's statement that "the federal funding freeze" continued was accurate. Even after this Court entered an administrative stay, and even after the purported "rescission" of the Order,

implementation continued.  For example, "the Environmental Protection Agency continued to pause funding disbursements *explicitly based* on the [OMB M-25-13] memorandum."  JA 327 (citing JA 81) (emphasis in original).  Other agencies, too, continued to freeze funds after the administrative stay.  *See, e.g.*, JA 84–85 (National Science Foundation message expressing continued compliance with Memo M-25-13); JA 94 (unable to drawn down funds from the Department of Health and Human Services and the Department of Labor); JA 96 (unable to draw down funds for veterans' services, including skilled nursing and suicide prevention); JA 100 (unable to draw down Medicaid funding that over 2 million Arizonans rely on); JA 163 (unable to draw down $408 million in Medicaid funding); JA 217 (unable to draw down funds administered by the Department of Justice and Department of Housing and Urban Development, including funding to curtail violent crimes against women).

### D.    The court enters a temporary restraining order.

On February 3, 2025, after briefing and a hearing, the district court denied the government's motion to dismiss and granted the nonprofits' motion for a temporary restraining order.  *See* JA 258–87.  The temporary

restraining order barred Defendants from "implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." JA 286. The order further required OMB to provide notice of the order to other agencies and instruct them similarly not to implement the Freeze Order and to release any disbursements on open awards that had been paused due to that Order. *Id.*

Following the entry of the temporary restraining order, the freeze thawed and funding gradually resumed flowing—slowly, and by degrees. *See* JA 289 (funds unfrozen February 6); JA 293 (funds unfrozen February 5); JA 295 (funds unfrozen February 4).

## E. The court enters a 705 stay and preliminary injunction.

Plaintiffs then filed a motion for a preliminary injunction. In a matter of days, the nonprofits compiled an extensive and undisputed record identifying the widespread, serious, and irreparable harms attendant to the Freeze Order. For example, one nonprofit—a National Council of Nonprofits member that provides critical services to West Virginians experiencing homelessness—was unable to access its funds for only nineteen hours. *See* JA 228–29. But even that short interruption

required the organization to temporarily shut down programs that assist people experiencing homelessness in obtaining birth certificates and identification cards, as well as a "Family Reunification" program that helps their clients travel elsewhere in the state and country. *See* JA 230. The organization also temporarily stopped intake into its rapid rehousing program. *See* JA 231.

Another member of the National Council of Nonprofits—a nonprofit that helps people with disabilities live in their own homes—had to lay off three of its five employees during the Freeze Order. *See* JA 255. Had state agencies not stepped in with a stop-gap measure, the nonprofit would have been forced to immediately reduce its services to "only the consumers with the most dire and pressing needs"—forced, for instance, to choose between job coaching a teenager with intellectual disabilities who recently aged out of the foster care system and transporting an eighty-six-year-old woman to dialysis treatment. *See* JA 255–57.

A member of Main Street Alliance who runs a daycare serving low-income families reported that without federal funding, her daycare would no longer be able to care for children with subsidized tuition payments, and that loss in income would lead to the daycare's closure in two months,

at most. *See* JA 251. Another member of Main Street Alliance explained that, unless the Freeze Order were paused, her small business would not be able to make payroll on February 7, 2025, would have to lay off its entire staff by the end of February at the latest, and would, for all practical purposes, cease to exist. *See* JA 223. That small business owner did not receive her grant funds until February 6. *See* JA 289. And a member of the American Public Health Association chairs an organization addressing infant mortality that received its grant funds on February 4; had those funds come one day later, the organization would have missed payroll. *See* JA 295–96.

The nonprofits also introduced undisputed evidence that if the temporary restraining order were lifted and the Freeze Order took effect again, they would imminently face layoffs and the closure of programs providing critical services to their communities. *See, e.g.*, JA 289, 293, 295–96, 304–05. At least one leader of a National Council of Nonprofits member organization had already changed her business habits as a result of the Freeze Order, drawing down funds more frequently—which takes up more administrative time and leaves less bandwidth for mission-critical work. *See* JA 231. And another member organization

was harmed by the uncertainty surrounding the reliability of federal grant disbursements itself. That organization focuses on providing intervention services to vulnerable families, helping those families stay together, and preventing child abuse. *See* JA 299. But although the organization was beginning a construction project that would enable it to expand its services in a low-income, rural community, it was forced to disclose to contractors that they may have to halt construction midstream if the Freeze Order were not more permanently enjoined—making it more difficult to secure vendors and leading the organization to reevaluate whether it felt secure enough in its (already awarded) funding stream to break ground. *See* JA 300–02.

These harms represent only a tiny fraction of the much larger harm the Freeze Order would cause if it continued. *See* JA 242–43; *see also New York v. Trump*, 764 F. Supp. 3d 46, 52 (D.R.I. 2025) (finding that, if the Freeze Order continued to be implemented, "there is a substantial risk that the States and [their] citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives"); D. Ct. Dkt. 25, at 41–42 (citing news reports that under the Freeze Order, preschools were unable to pay their staff, disaster aid to

Los Angeles and North Carolina was endangered, elderly people who depend on Meals on Wheels to eat did not know if they would have food, an Alabama city risked being unable to fix its drinking water system, scientific research was disrupted, and Head Start programs faced imminent closure).

On February 25, 2025, the court granted the nonprofits' motion. The court first dispatched the government's threshold arguments, concluding that "there is no question that Plaintiffs had standing when they initially brought their complaint," JA 324, and that subsequent events had not mooted the case, JA 330. Rather, the court found, it appeared that OMB had not "ceas[ed] the challenged conduct" at all, much less "show[n] that [it] will not resume the challenged activity." JA 330–31 (quotation marks omitted). The court further rejected the government's ripeness arguments, concluding that they, "like [the government's] mootness arguments, wholly disregard the factual circumstances of this case and its context." JA 337.

As to the likelihood of success on the merits, the court concluded that the Freeze Order constituted a final agency action under the APA, JA 342, and that the nonprofits were likely to succeed in their APA

challenge. As to plaintiffs' arbitrary-and-capricious claim, the court explained, the "touchstone . . . is rationality, and Defendants' actions flunk that test." JA 343. The court concluded that the Freeze Order "was not—and could never be—rational, especially when the decision was made without grappling with its catastrophic effects or the logistical nightmare of its implementation." *Id.* The court also found a likelihood of success on the nonprofits' excess-of-statutory-authority claim, noting that the government had "not pointed to specific authority that allows it to unilaterally pull the plug on nearly all federal monetary flows." JA 346. The court further explained that "this case easily qualifies" for the major questions doctrine, *id.*, and that there was "no clear statutory hook for this broad assertion of power" and its "massive" ramifications. JA 347. As to the nonprofits' First Amendment claim, the court noted that "[w]hile the answer is not obvious at this early stage, Plaintiffs have shown some likelihood of success," and that "[b]y appearing to target specific recipients *because* they associate with certain ideas, Defendants may be crossing a constitutional line." JA 348–49 (emphasis in original). The court did not base its grant of relief on the First Amendment claim.

The court further found that the nonprofits made a "strong showing of irreparable harm," JA 349, explaining that "[t]he injunctive relief that Defendants fought so hard to deny is the only thing in this case holding potentially catastrophic harm at bay." JA 350–51. And as to the final factor, "the balance of the equities and the public interest continue to weigh heavily in favor of injunctive relief." JA 351. The court found that "the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated." *Id.*

The court's order barred Defendants "from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." JA 354. The court made clear that "this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706." JA 355; *see also* JA 337 (describing legal standard for both preliminary injunction and section 705 stay).

The court also denied as premature the government's request for an administrative stay pending appeal, inviting the government to renew its request after reviewing the court's opinion. JA 352. The government

chose not to do so, and did not request a stay from this Court. It timely filed its notice of appeal on April 24, 2025, fifty-eight days later. JA 356.

## SUMMARY OF ARGUMENT

OMB issued a short but sweeping order requiring all agencies to freeze trillions of dollars in federal financial assistance across the country, across sectors, on less than a day's notice, and for an indefinite period. The Freeze Order is the epitome of arbitrary and capricious agency decisionmaking. And OMB has not identified any statutory provision that would authorize it to simply shut off nearly all already-awarded federal funding, much less a provision that clearly authorizes that action, as the major-questions doctrine requires.

The government can identify no abuse of discretion in the district court's conclusion that these actions likely violate the Administrative Procedure Act—and it barely even tries. Instead, it denies the reality of OMB's actions, arguing that the nonprofits, the district court, and federal agencies across the government all managed to misread the plain text of the Freeze Order. This effort to rewrite the past finds no purchase in the record evidence or in the law.

The government's arguments as to mootness fail for similar reasons. The court found that OMB's purported rescission of the Freeze Order was nothing better than an empty gesture, and the government is unable to point to any evidence that would undermine that finding—let alone establish an abuse of discretion. Nor can the government identify any evidence to meet its burden of showing that it is absolutely clear OMB would not return to its old ways.

The remaining preliminary-relief factors likewise favored the nonprofits. The district court marshalled significant evidence of irreparable harm, which the government does not meaningfully contest on appeal. And the court correctly judged that the public interest did not favor allowing OMB to continue its arbitrary and unlawful actions. The court accordingly ordered a remedy that—appropriately for an APA case—matched the scope of the challenged agency action. The district court acted well within its discretion, and this Court should affirm in full.

## STANDARD OF REVIEW

To obtain preliminary relief, "a party must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips

in [its] favor, and that an injunction is in the public interest." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025) (quotation marks omitted); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024). This Court "review[s] the District Court's weighing of those factors for abuse of discretion, its legal conclusions *de novo*, and factual findings for clear error." *Media Matters*, 138 F.4th at 573.

## ARGUMENT

## I. The district court properly construed the Freeze Order.

Central to many of the government's arguments on appeal is its claim that the Freeze Order did not direct a halt to all federal financial assistance, but only to assistance "implicated by" certain executive orders. That claim cannot be squared with the text or logic of the Order. And it is inconsistent with the district court's factual findings about how other agencies understood and applied the Order. The court correctly interpreted the Freeze Order, and the government's post hoc efforts to rewrite that order fail badly, as do its many arguments based on that revisionist history.

As the district court recognized, JA 332–34, the Freeze Order commanded agencies to immediately halt *all*—not just some—federal

financial assistance. At the outset, the Order explained that it "require[d] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," including seven specified executive orders. Freeze Order 1, Add. 1. To do so, "each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Id.* at 2. "*In the interim*," the Order continued, "to the extent permissible under applicable law, Federal agencies must temporarily pause *all* activities related to obligation or disbursement of *all* Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders . . . ." *Id.* (bolding omitted; italics added).

OMB several times reiterated the broad scope of its Freeze Order. For example, the Order "also direct[ed] Federal agencies to pause all activities associated with open NOFOs"—i.e., notices of funding opportunity, by which new awards are announced—not just notices that may be implicated by the President's executive orders. *Id.* Similarly, it emphasized that "[e]ach agency must pause . . . issuance of new

awards"—not just *some* new awards—and must also pause "disbursement of Federal funds under *all* open awards." *Id.* (emphasis added). The Order further made clear that it was OMB's call, not that of the agencies, whether any funds could escape the pause, stating that "*OMB* may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis." *Id.* (emphasis added).

The agencies that received the Order well understood that it directed them to freeze *all* federal financial assistance, as their actions and the record amply show. The Environmental Protection Agency, for example, emailed grant recipients that, in response to the Order, it was "temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time." JA 327; *see also* JA 73–74, 76, 81. The National Science Foundation stated that, also in response to the Order, "all review panels, new awards and all payments of funds under open awards will be paused." JA 84–85. Numerous agencies implemented the Order by taking offline or otherwise rendering inaccessible the online funding portals through which many recipients access funds, JA 335, 340 n.9, 351; *see also* JA 266—a step that

is wholly inconsistent with the more targeted freeze OMB now claims it ordered. And the record in the district court contained evidence of frozen funds that the government was unable to attribute to any directive other than the Freeze Order itself. *See* JA 275–76.

On appeal, the government contends (at 20–22) that the district court, the nonprofits, and the federal agencies that carried out OMB's instructions have universally misread the Order—have, in fact, read it "in a manner irreconcilable with its plain text." The government claims the Order directed agencies to freeze only those funds "implicated by" certain executive orders. It notes that the Order, in addition to requiring a halt to "all activities related to obligation or disbursement of all Federal financial assistance," also told agencies to cease "other relevant agency activities that may be implicated by the executive orders." The government seemingly understands the phrase "may be implicated by the executive orders" to modify not only "other relevant agency activities" but also "all Federal financial assistance."

That view ignores that OMB specifically chose to separate the two phrases with a comma, thus "indicat[ing] that they were to be treated as distinct categories for the pause." JA 333. And it runs contrary to the

rule of the last antecedent, which "provides that 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also City of Salisbury, N. Carolina v. FERC*, 36 F.4th 1164, 1168–69 (D.C. Cir. 2022) (applying same rule); *Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*, 926 F.3d 819, 824 (D.C. Cir. 2019) ("[O]rdinarily, and within reason, modifiers and qualifying phrases attach to the terms that are nearest."). OMB cannot avoid the import of its own words by, in essence, accusing the district court of reading the Order *too* carefully. *Cf.* Br. at 21–22.

Nor is the government helped by the Order's "broader context," which only confirms the district court's reading. *Contra id.* at 22. Stepping back, what the Order did is command a halt to essentially all federal financial assistance in order to allow time to identify what programs were implicated by the executive orders. It instructed agencies to (1) "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders" and,

(2) "*[i]n the interim*," halt all obligation and disbursement of "all Federal financial assistance."  Freeze Order 2 (emphasis added).  In other words, the Order told agencies to "freeze first, ask questions later."  JA 344.

The account the government presses on appeal cannot be reconciled with that approach.  As the district court explained, "[i]t would make little sense for agencies to only pause activities associated with the executive orders while evaluating what activities are even associated with the executive orders in the first place."  JA 333.  The government has no answer.  Indeed, it does not even acknowledge that the Order, by its logic and express terms, told agencies to identify funding that may be implicated by the executive orders and, while doing so ("in the interim"), to freeze *all* funding.

Here as elsewhere, the government repeatedly notes the Freeze Order's boilerplate caveat, "to the extent permissible under applicable law."  But the government fails to explain how this phrase could support its view that the Order freezes only those funds that may be implicated by one of the executive orders.  It does not.

The government falls back (at 22–23) on a document OMB released the day after the Freeze Order (and the same day this litigation was

filed), in apparent response to the widespread chaos the Order had produced, *see, e.g.*, Jeff Stein et al., *White House pauses all federal grants, sparking confusion*, Washington Post (Jan. 28, 2025), https://perma.cc/K8J2-K3GQ; Kelsey Tamborrino et al., *Trump's spending freeze spreads chaos across US*, Politico (Jan. 28, 2025), https://perma.cc/3ST7-CQQK.

That document, which the government describes as "guidance," provides a Q&A addressing questions about the Freeze Order, such as, "Is this a freeze on all Federal financial assistance?" JA 62–63. It states, among other things, that: "[a]ny program not implicated by the President's Executive Orders is not subject to the pause"; "mandatory programs like Medicaid and SNAP will continue without pause"; and "[f]unds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs will not be paused." *Id.*

The district court rightly rejected the government's resort to this "guidance" and its purported interpretation of the Freeze Order. *See* JA 339. It is blackletter law that courts may not accept an agency's interpretation that is "plainly erroneous or inconsistent with the regulation," such as when "an alternative reading is compelled by the

regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quotation marks omitted); *see also* 5 U.S.C § 551(4) (defining a "rule" to include any "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"). "[I]f 'there is only one reasonable construction of [the] regulation,' then 'the court must give it effect.'" *Peabody Midwest Mining, LLC v. Mine Safety & Health Admin.*, 70 F.4th 602, 607 (D.C. Cir. 2023) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (plurality opinion)).

As explained, there is only one reasonable construction of the Freeze Order, and it is not the one offered in the Q&A. JA 339–40 (noting that "the language of the OMB Guidance Document appears to contradict that of the original memorandum"). Most glaringly, the Q&A reads the Freeze Order as not applying to "[a]ny program not implicated by the President's Executive Orders," while the Freeze Order by its express terms and logic covers all federal financial assistance. Nor is there any basis in the Order for the exceptions the Q&A purports to find there for

programs such as Head Start, those benefiting small businesses or farmers, or "other similar" (but undefined) programs. *See* JA 63.

Even setting aside that the Q&A cannot be squared with the Order, the release of that Q&A came far too late for it to have any effect on agencies' implementation of the Order. The Q&A was not issued until sometime on January 28—the day after the Freeze Order was issued (and the same day this lawsuit was filed), and just hours before the 5 p.m. deadline by which agencies were required to shut off funding. JA 340. "Clearly, that was not enough time" for agencies to review trillions of dollars in financial assistance and determine which programs and awards may be "implicated" by certain executive orders. *Id.* And indeed, there is no evidence in the record to suggest that *any* agency implemented the Order in the manner offered in the Q&A, as opposed to the clear instructions of the Order to shut off all financial assistance. *See id.*; *compare also, e.g.*, JA 62 (stating that Medicaid "will continue without pause"), *with* JA 100, 163 (unable to draw down Medicaid funding).

The government now suggests (at 24, again without evidence) that the implementation that resulted—"for whatever reason"—must be due to agencies' independent decisions and not the Order. But given that

agencies across the board acted simultaneously, on the timeline prescribed by the Freeze Order, and in many cases explicitly cited the Freeze Order itself, the district court was "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quotation marks omitted). Contrary to the government's arguments (at 24), the Freeze Order plainly creates more than a "mere possibility that some agency might make a legally suspect decision." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *cf. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (rejecting reliance on *Allbaugh* in analogous circumstances).

## II. The nonprofits are likely to succeed on the merits.

The district court correctly concluded that the nonprofits were likely to succeed on the merits of two APA claims: that the Freeze Order was arbitrary and capricious, JA 342–45, and that it was in excess of statutory authority, JA 345–47. Affirmance requires only one.

Although the court discussed the nonprofits' argument that the Freeze Order was contrary to the First Amendment, JA 347–49, it concluded only that the nonprofits "have shown some likelihood of

success on their First Amendment claim" at "this early stage," JA 348, and that the government "may be crossing a constitutional line," JA 349. Because, as the government itself acknowledges (at 34), the court did not rely on this third claim in concluding that the nonprofits were likely to succeed on the merits, it is not raised in this interlocutory appeal and the Court need not (and should not) reach the government's arguments (at 34–38) regarding the First Amendment unless or until the district court rules in the first instance.

## A.   The Freeze Order is arbitrary and capricious.

The APA "requires agencies to engage in reasoned decisionmaking and directs that agency actions be set aside if they are arbitrary or capricious." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation marks and citation omitted).  In applying that standard, "a court may not substitute its judgment for that of the agency," but it must ensure that the agency action was both "reasonable and reasonably explained."  *Ohio*, 603 U.S. at 292 (quotation marks omitted).  This requires, among other things, "that the agency has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," and has not "simply ignore[d] an

29

important aspect of the problem." *Id.* at 292–93 (quotation marks and brackets omitted). When an agency changes course, it also must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Univ. of Cal.*, 591 U.S. at 33.

The district court correctly applied that law in concluding that the nonprofits were likely to show that the Freeze Order—"cut[ting] the fuel supply to a vast, complicated, nationwide machine," and doing so "practically overnight"—was arbitrary and capricious. JA 342–45. The district court concluded that the Freeze Order "was not—and could never be—rational" substantively, JA 343, that the government "still cannot provide a reasonable explanation" for it, *id.*, that the government acted "seemingly without any consideration for the consequences of [its] decision," *id.* (quotation marks omitted), that the government "entirely failed to consider multiple important aspects of the problem," JA 344 (quotation marks, citation, and alterations omitted), and that the government "entirely failed" to consider "significant reliance interests," *id.* In sum: the government's "actions were irrational, imprudent, and precipitated a nationwide crisis." JA 344–45. Any one of these findings,

let alone all of them, would support the conclusion that the Freeze Order was likely arbitrary and capricious. The government offers no basis, on appeal, to undermine the court's well-reasoned exercise of its discretion.

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). But instead of directing the Court to a "basis articulated by [OMB] itself," *see id.*, the government simply states (at 31) that "[t]he connection between the Memorandum's objective and its directions was plain," and then offers its own explanation. "[C]ounsel's *post hoc* rationalizations for agency action" cannot suffice. *See State Farm*, 463 U.S. at 50.

At best, the Freeze Order itself states merely that the freeze will provide "time to review agency programs and determine the best use of funding." Freeze Order 2. But this cursory statement offers no reason that the review could not have occurred while funding flowed in the ordinary course, so that only programs of concern were affected, nor does it grapple with the many obvious downsides the Freeze Order would (and did) entail. The government argues that the Freeze Order "explained

that its objective[s]" included "safeguard[ing] valuable taxpayer resources." Br. at 31 (citing Freeze Order 1). But stating an objective cannot substitute for providing a reasoned explanation for how an agency plans to achieve that goal.

The government attempts to find safe harbor by pointing out that, unreasonable as the Freeze Order was, it could have been less reasonable still. For example, the government says that the Freeze Order exempted "assistance received directly by individuals." Br. at 32 (quoting Freeze Order 1 n.1). But that is not an exemption at all, merely a restatement of the regulatory definition of "federal financial assistance" on which OMB relied, which already does not include money disbursed directly to "individuals that are participants or beneficiaries." *See* Freeze Order at 1 n.1; 2 C.F.R. § 200.1 (definitions of "Federal financial assistance," "Recipient," and "Subrecipient," as well as "Cooperative agreement" and "Grant agreement or grant").

Similarly, the government suggests (at 31) that the Freeze Order also exempted "payments required by law," an apparent reference to the Freeze Order's boilerplate caveat, "to the extent permissible under applicable law." Freeze Order 2. But this language hardly presents a

meaningful exemption given that, as the district court found, agencies had no practical ability to give it effect in the single day they had to shut off the flow of trillions of dollars in federal funding. *See id.* And even if this caveat somehow could have been given effect during the twenty-four hours agencies had under the Freeze Order, that would hardly render the Order reasonable: "Just because an agency *can* do something [because not expressly prohibited by law] does not make it *rational* to do so." *Id.* (emphasis in original). The APA requires more—including, for example, that the agency consider important aspects of the problem before it.

Even if these were meaningful carve-outs, the question is not whether OMB made the worst of all possible decisions. If identifying ways that an agency action could have been worse were enough to defeat an arbitrary and capricious challenge, no action would ever be held unlawful under that standard. The question is whether the decision OMB *did* make was reasonable and reasonably explained. And these limited exceptions—if they are even exceptions at all—do not transform the Freeze Order into a "calibrated approach," Br. at 32, however much the government might wish it. Instead, as the district court found—and

the government has put forward no facts to dispute[1]—the Freeze Order implicated a "potential $3 trillion in financial assistance," a "breathtakingly large sum of money to suspend practically overnight." JA 343 (quotation marks and citation omitted). Perhaps recognizing that its actions were indefensible, the government now suggests (at 32) that is not what the Order really required. But for all the reasons discussed above, *see supra* Sec. I, the government's argument that the Freeze Order applied only to a subset of funds related to certain executive orders strains both logic and credulity.

The government next contends (at 32–33) that the Freeze Order "was particularly reasonable" in permitting agencies to ask for exceptions on a case-by-case basis. Given the impossibly short turnaround, this supposed safety valve is illusory. As the district court observed, it is not clear whether that time frame "is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." JA 344 (quotation marks and citation omitted). The effect is the

---

[1] The government states that the record "reflects that OMB 'worked with agencies' to 'approv[e] many programs to continue.'" Br. at 32 (quoting JA 62). But the government fails to support that claim with evidence.

same as if there were no opportunity to ask for exceptions at all: freezing first, and then evaluating over a more extended period of time.

The district court also correctly concluded that the government failed to appropriately consider the consequences of this decision. The government fails to point to any evidence that would permit this court to deem that conclusion an abuse of discretion.[2] At best, the government states (at 32) that "the Memorandum expressly considered the consequences of the pause." But the government does not provide a quotation, or even a citation, for that proposition, and the nonprofits (like the district court) are unable to locate any such "express consider[ation]" in the document. Nothing in the Freeze Order addresses the vital services that recipients of federal financial assistance provide to their communities and the nation, *see, e.g.*, JA 210, 218, 227, 237, 254, 299, the exceedingly thin margins on which many grantees operate, *see, e.g.*, JA 230–31, the immediate disruption to their ability to provide services

---

[2] That conclusion was further confirmed by the certified administrative record, which the government produced following the order appealed from here. Those materials—constituting the whole of what OMB says it considered before issuing the Freeze Order—consist solely of the Freeze Order itself, the executive orders referenced in the Order, and the Q&A that OMB issued *after* the Order came out.

that even a short pause would entail, *see id.*, the fact that funds can be significantly slower and more cumbersome to turn back on than to shut off in the first place, *see, e.g.*, JA 289, 293, 295, 390, or the trade-offs between the Freeze Order's stated objective and the predictable and drastic costs that would (and did) immediately ensue.

So too reliance interests. The government, again, is unable to point to any line in the Freeze Order (or elsewhere) demonstrating that OMB took significant reliance interests into account. It implausibly asserts (at 33) that the Freeze Order "contemplated that funds would continue being disbursed in circumstances where reliance interests would be most acute." But there is no actual evidence that the government ever considered reliance interests at all. Counsel's *post hoc* statements (at 34) that the Freeze Order "undertook to balance the important government interests against the need to continue funding certain programs," is not a substitute. And the government's blithe suggestion (at 34) that the Freeze Order simply left reliance interests for the agencies to consider ignores the reality that those funds were to remain frozen while the agencies consider those interests: exactly backward from what the APA requires. *See, e.g.*, *Univ. of Cal.*, 591 U.S. at 35–36; *Int'l Org. of Masters,*

*Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (concluding that "we are left with no choice but to vacate the Board's arbitrary and capricious decision" because it acted "with no regard for the parties' reliance interests").

The government was also required "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Trans.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). The government does not even try to argue that it did so here, even though there were sufficiently obvious alternatives such that, "[a]t the very least," they "should have been addressed and adequate reasons given" for their rejection. *State Farm*, 463 U.S. at 48, 50–51. For example, the government could have chosen to review grant funding without inciting a nationwide catastrophe by cabining the freeze to new awards, providing more time for agencies to implement the order and for recipients to prepare, or simply conducting the review while allowing federal financial assistance programs to carry on in the ordinary course. "The failure of an agency to consider obvious alternatives," as here, "has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

At bottom, the government seems to argue (at 31) that simply "effectuat[ing] the President's Executive Orders" is enough. The Freeze Order goes well beyond effectuating those orders. *See* Sec. I. But in any event, a mere statement of purpose is not a rationale. And if accepted, that proposition would eviscerate the foundational understanding of the APA. As courts have long understood, agency action must be both "reasonable and reasonably explained," *Ohio*, 603 U.S. at 292, and "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015). The government offers no evidence that it did so, or that it considered myriad "important aspect[s] of the problem," *Ohio*, 603 U.S. at 293 (quotation marks omitted). As the district court found, "[e]valuating funding priorities can be done without needing to starve citizens or deny critical health services." JA 343.

## B. The Freeze Order was issued without statutory authority.

The government likewise fails to identify any abuse of discretion in the district court's finding that the OMB Defendants' actions likely exceeded their statutory authority.

Binding precedent makes the inquiry here straightforward. As the district court recognized, that precedent holds that agencies "literally have no power to act except to the extent Congress has authorized." JA 345 (quoting *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024) (quotation marks and brackets omitted)). The sole congressional authorization the government points to (at 27) is 31 U.S.C. § 503(a)(2), which tasks the deputy director for management at OMB with "establishing financial management policies and requirements" in order to "[p]rovide overall direction and leadership to the executive branch on financial management matters." That provision cannot plausibly be read to confer authority to direct the near-immediate, government-wide halt of nearly all federal financial assistance, a conclusion that the court correctly found was buttressed by other binding precedent concerning the major-questions doctrine. JA 346–47.

On appeal, the government largely seeks to avoid the relevant inquiry. It focuses first (at 25–26) on the President's authority—not OMB's. But the President is not a party to this case, which concerns the application of ordinary APA principles to final action by an agency defendant. The scope of the President's authority is simply not at issue

here. Nor is there any evidence in the record to support the government's apparent suggestion that the President directed issuance of the Freeze Order. To the contrary, public reporting indicates exactly the opposite: that OMB issued the Order without even consulting key White House officials. *See* Jonathan Swan & Zolan Kanno-Youngs, *Inside the Chaotic Rollout of Trump's Federal Funding Freeze*, N.Y. Times (Jan. 29, 2025) (reporting that the Order "was published without vetting by key officials in the White House"), https://perma.cc/VEL3-32MT; Ashley Parker, *The Memo That Shocked the White House*, The Atlantic (Jan. 29, 2025) (same), https://perma.cc/4P5M-MYX2. The government's related suggestion (at 29) that the Order was not the source of the direction to freeze funding, but instead simply reiterated instructions to freeze funding that were contained in certain executive orders, rests on the same misreading of the Order already refuted above. *See supra* Sec. I.

The government's other arguments fare no better. Its apparent view (at 26) that OMB has statutory authority to take any and all steps OMB believes may "help[] to implement the President's Executive Orders" is foreclosed by precedent concerning the limits of agency authority. *See, e.g.*, *Marin Audubon*, 121 F.4th at 912. Its reliance on

40

two previous executive orders (at 28) ignores that the narrow pauses on funding directed by those orders are a world away from the sweeping freeze Defendants ordered here; that Defendants' action went far beyond the scope of any relevant executive orders; and that an agency's own view of its "traditional role" is no substitute for actual statutory authority, *see Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) ("No matter how consistent its past practice, an agency must still explain why that practice comports with the governing statute and reasoned decisionmaking.").

The government's attempts (at 29–30) to evade application of the major-questions doctrine likewise fail because those arguments concern *the President's* authority, while the relevant question here is limited to *OMB's* authority under statute. The government's related claim that OMB's Order concerned only the "internal management of the Executive Branch" is mistaken and ignores the obvious effect on the public of precipitously halting open awards of federal financial assistance. *See also Biden v. Nebraska*, 600 U.S. 477, 505 (2023) (emphasizing that major-questions doctrine applies equally in cases involving regulatory obligations and "in cases involving benefits").

**C.** **This case was not moot when the preliminary injunction was issued and is not moot now.**

The district court likewise correctly concluded that this case is not moot. JA 329–36. A case is moot where "events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it." *FBI v. Fikre*, 601 U.S. 234, 240 (2024). But "[n]one of this implies that a defendant may automatically moot a case by the simple expedient of suspending its challenged conduct after it is sued." *Id.* at 241 (quotation marks omitted). That is precisely the situation here—to the extent the defendants suspended their challenged conduct at all—and the government has put forward no evidence that the district court clearly erred in so concluding.

Under the voluntary cessation doctrine, a defendant's choice to stop "a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *Id.* (quotation marks omitted). The Supreme Court has "described this as a formidable burden," and one that "holds for governmental defendants no less than for private ones." *See id.* (quotation marks omitted). To protect the "federal court's constitutional authority" from being "readily manipulated," "a defendant must prove no reasonable expectation

remains that it will return to its old ways." *Id.* (quotation marks and alteration omitted). And that showing must be "absolutely clear." *Public Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (quotation marks omitted). Here, the government cannot even show that it actually ceased its illegal conduct—much less that such conduct will absolutely not recur.

The government hangs its hat on OMB's purported rescission of the Freeze Order. But, as the district court found, the supposed rescission was undercut by both administration statements to the contrary and evidence that the funding freeze continued.

First, the court found that "the White House Press Secretary appeared to completely contradict the act of rescission by expressly stating that it was 'NOT a rescission of the federal funding freeze.'" JA 330. As the court explained, "[b]y any reading of the Press Secretary's remarks, the memorandum's retraction was an empty gesture." JA 330. Given that the remarks specifically referenced the court's administrative stay, *see* JA 319 ("Why? To end any confusion created by the court's injunction."), the court was well within its discretion to conclude that "it appears that OMB sought to overcome a judicially imposed obstacle

without ceasing the challenged conduct," JA 331 (quotation marks and ellipsis omitted).  The government now disputes that account (at 15), but its argument relies on again erroneously conflating the executive orders with the broader funding freeze, which the remarks made clear remained in effect.  And even if the Press Secretary's remarks created some ambiguity (which they did not), ambiguity falls far short of the absolute clarity regarding cessation the government was required to show.  *See Public Citizen*, 92 F.4th at 1128.

Second, the court also relied on record evidence that even after the purported rescission, the funding freeze continued.  *See* JA 331 (citing JA 211–12, JA 218, JA 250); *see also, e.g.*, JA 255 (explaining that grant recipient had not received any funds as of February 2).  In other words, even if OMB purported to rescind the Freeze Order, that agency action was still very much in effect.  The evidence amply supports the court's conclusion, and the government offers no basis to find the court clearly erred in its assessment of these facts.

The government suggests (at 14–16) that any continued funding freeze was due to the executive orders, rather than the Freeze Order.  But again, the government fails to provide any citation supporting this

speculation. *Cf. Fikre*, 601 U.S. at 239–40, 242 (holding that government failed to meet its burden to establish mootness even where it submitted sworn declaration from relevant agency official). And it utterly ignores the record evidence to the contrary: as the district court made clear, it found that "the effects of the [Freeze Order] and the President's executive orders were not coextensive"—i.e., that significant funds remained frozen that could not possibly be attributable to any specific executive order. JA 332; *see also id.* ("At the TRO hearing, Defendants could not explain all the frozen funding by relying on the executive orders alone."); JA 275–76 (describing, in TRO opinion, evidence that "the scope of frozen funds appears to extend far beyond the reach of the executive orders"); D. Ct. Dkt. 26, at 6 (government itself arguing that there was not "a clear link" between a particular nonprofits' harms and any of the relevant executive orders); JA 335, 340 n.9, 351 (finding that agencies had closed funding portals, effectively cutting off access to any federal financial assistance).

In the absence of evidence supporting its position, the government simply states (at 14) that the district court's conclusions were "illogical." In the government's view, a freeze order pending a review "would necessarily happen only once, shortly after the Executive Orders were

issued and before OMB had a chance to conduct its review." *Id.* This bare assertion does nothing to help the government meet its "formidable burden" to "prove no reasonable expectation remains that it will return to its old ways," *Fikre*, 601 U.S. at 241 (quotation marks and alteration omitted), particularly given the reality that OMB may institute a renewed freeze at any time, *see infra* at 46–47.

Unable to show that the court clearly erred in its evaluation of the facts, the government suggests (at 16) that even if the case was not moot when the court entered its order, it has since become moot. But although the government suggests (at 16–17) that implementation of the Freeze Order has, at this point, "plainly . . . been overtaken by subsequent events," it does not put forth any evidence that OMB has in fact moved on from funding freezes, much less any evidence that could carry the government's "formidable burden." *Fikre*, 601 U.S. at 241. Rather, events during the recent lapse in appropriations show that Defendants are keen to resume funding freezes. *See, e.g.*, Russ Vought (@russvought), X (Oct. 17, 2025, 2:24 PM), https://perma.cc/5JXM-5BVY (announcing "immediate[] paus[e of] over $11 billion in lower-priority projects"); Russ Vought (@russvought), X (Oct. 3, 2025, 7:29 AM),

https://perma.cc/HS98-Q88R (announcing that "$2.1 billion in Chicago infrastructure projects . . . have been put on hold"); Russ Vought (@russvought), X (Oct. 1, 2025, 9:54 AM), https://perma.cc/FE2Q-99ZW (announcing that "[r]oughly $18 billion in New York City infrastructure projects have been put on hold").  To the extent the broader Freeze Order is a "distant memory," that is precisely because it has been stayed.  The fact that the government has (in the end) complied with a still-extant court order does not and cannot moot the case.

The government therefore has offered nothing to support (much less carry its burden on) its fallback claim that this case became moot sometime after the district court entered its order.  To the extent the Court had any doubts (and it should not), the proper course would be to affirm the grant of preliminary relief and remand with instructions for the district court to evaluate the relevant facts in the first instance—not to make that judgment here based on little more than the government's say-so.  *See Doe v. SEC*, 28 F.4th 1306, 1316 (D.C. Cir. 2022) ("[W]e are a court of review, not of first view." (quotation marks omitted)).

Rather than addressing these fundamental points, the government offers (at 17–18) that if it were to backslide, the nonprofits could simply

bring another lawsuit. Again, that is not the law. The government cannot fail to carry its burden under the voluntary cessation doctrine, and then announce that it is *plaintiffs* who must bear the burden of filing another action, yet again on an emergency basis. This theory—which the district court rightly rejected, *see* JA 335—is thoroughly inefficient and particularly egregious in light of the undisputed record evidence that even a very short delay in funding would be catastrophic for many nonprofits. *See id.*; *see also, e.g.*, JA 293.

So the government argues (at 15, 17, and 30), that even if the case is not moot, the request for a preliminary injunction or the arbitrary and capricious claim would be. But this just repackages the government's failing arguments: it relies on the proposition that the purported rescission was real and complete, but does no more to address the district court's findings to the contrary. And the government still makes no effort to prove that it would not do the same again. At best, the government argues (at 30) that any reissued memorandum was "unlikely" to be issued "under similar circumstances and for the same reasons" as the prior one. But the government bears the burden of proving that, and a statement in a brief (at 15) that the facts here are "unlikely to recur" is not evidence.

And—setting aside whether any explanation could possibly render a resuscitated freeze order "reasonable" —there is no basis to assume the government would issue a more reasoned explanation in the future. After all, the purported rescission did not stop the Freeze Order's continued implementation—without the government providing any additional rationale.

## III. The nonprofits amply demonstrated irreparable injury and the public interest favors affirmance.

The district court acted well within its discretion in finding that the remaining factors weighed in favor of relief. As to irreparable harm, the court concluded that the nonprofits had made a "strong showing." JA 349. As the court explained, the nonprofits "produced significant evidence" that the Freeze Order "will not simply inconvenience them, it will devastate them." JA 350. The court based these findings on numerous declarations submitted into evidence recounting "existential injuries." *Id.* (quotation marks omitted); *see also supra* 10–14.

The government does not dispute the facts substantiating these significant and widespread harms. Instead (at 41–42), the government largely repackages its arguments about the merits and scope of relief, which fail for the same reasons addressed elsewhere. To the extent the

government addresses the facts at all, it mischaracterizes them (at 11 and 42) as reflecting "relatively minimal" "monetary harms" that can be easily remedied by compensatory damages later.

This argument gets the government nowhere, because it is waived, and because it is wrong. "Generally, an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent exceptional circumstances." *Flynn v. CIR*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001) (quotation marks omitted). But the government failed to argue in opposing the nonprofits' motion for preliminary relief that their harms were reparable monetary damages. *See* D. Ct. Dkt. 47, at 37–39.

Even if the court were to consider this argument, it should reject the government's characterization. The nonprofits' well-documented and extensive harms—such as shuttering crucial programs—were not of the type that could simply be redressed later through monetary compensation. *See, e.g.*, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (explaining that "obstacles" that "make it more difficult for [plaintiffs] to accomplish their primary mission" suffice to show irreparable injury); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C. Cir. 1985) (explaining that economic injuries are irreparable if they pose an existential threat). The government can identify nothing in the record to support its belated attempt to recharacterize these harms— much less anything that could establish that the district court abused its discretion. *See* JA 349–50 (applying correct standard to the evidentiary record).

As to the balance of the equities and the public interest, the government likewise ignores the district court's findings that those factors "weigh heavily in favor of injunctive relief." JA 351. Relying on ample record evidence, the court found "a stark picture of nationwide panic in the wake of the funding freeze," leading "[m]any organizations . . . to resort to desperate measures just to stay operational." *Id.* (quotation marks, citation, and alteration omitted). The court concluded that the Freeze Order "placed critical programs for children, the elderly, and everyone in between in serious jeopardy," and that "the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated." *Id.*

Largely ignoring that side of the ledger, the government highlights (at 40–41) its "and the public's . . . interests in protecting the public fisc,"

which it contends would be "grave[ly] harm[ed]" to the extent the court's order "could plausibly affect some future directive to pause funding." First off, OMB's concern for its ability to order additional funding freezes in the future is directly inconsistent with its claims of mootness. More to the point, the government's argument ignores that it had numerous other, more rational means of "protecting the public fisc" (even assuming that the Freeze Order advanced that interest at all). There was no compelling government interest in pursuing the particular, and extraordinarily irrational, agency action at issue in this case—which even the government has now disclaimed by purporting to rescind that action and arguing that the dispute is moot. *See Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency activity," but "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (quotation marks and citations omitted)). Nothing in the government's brief comes close to establishing that the district court abused its discretion in weighing the equities. *See Media Matters*, 138 F.4th at 573.

## IV.   The remedy ordered was consistent with APA principles and well within the district court's discretion.

There was no error in the scope of relief the district court ordered, which properly focused on the agency action at issue, rather than on specific plaintiffs. That framing was consistent with APA principles, appropriate in light of the nature of Defendants' actions and the irreparable harm those actions caused, and well within the court's discretion. The government's contrary arguments are incorrect.

The government primarily argues (at 42–45) that the district court's order conflicts with *Trump v. CASA*, 606 U.S. 831 (2025). But the court awarded relief under the APA of the type the Supreme Court specifically emphasized it was not addressing in *CASA*. *See id.* at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring). As the government acknowledges (at 43), the court expressly provided that its order "shall apply to the maximum extent provided by . . . 5 U.S.C. §§ 705 and 706." JA 355. The court's analysis specifically contemplated the legal standard under section 705. *See* JA 337. And the parties and court addressed the scope and appropriateness of relief under section 705 during the hearing, with the nonprofits emphasizing that the "same standard . . . applies for granting a 705 stay" as a preliminary injunction, that "a Section 705 stay

operates on the action itself and isn't specific to defendants or plaintiffs," and that such relief "would be appropriate" in this case. Tr. of Feb. 20, 2025, Mot. Hr'g at 48–49, 18–19, Add. 9–10, 5–6; *see also id.* at 41–42, Add. 7–8; D. Ct. Dkt. 40-8 at 2 (Plaintiffs' proposed order, seeking relief "to the maximum extent provided for by . . . 5 U.S.C. §§ 705 and 706"). The government therefore errs in claiming (at 43) that the court was not purporting to exercise APA authority when it granted relief.

The government claims (at 44–45) that the order cannot be read as a section 705 stay because it "both compels and restrains" agency action. But the order merely barred OMB from "implementing, giving effect to, or reinstating under a different name" the directives in Freeze Order with respect to open awards. JA 354. That is nothing more than a statement of the natural consequence of staying the Freeze Order; it is difficult to see how that provision orders the government to do anything that is not already required by the section 705 stay.

As a fallback, the government argues (at 45–46) that even if this were a section 705 order (and it is), relief under section 705 should be limited to Plaintiffs, "consistent with the equitable principles articulated in *CASA*." But *CASA*, again, specifically did not address the scope of

relief under the APA, *see CASA*, 606 U.S. at 847 n.10, and its reasoning does not translate to that different context. The Court's holding, after all, turned on its interpretation of the Judiciary Act of 1789; the Court found that the Act did not provide courts with "equitable authority to issue universal injunctions." *Id.* at 839. Yet, as Justice Kavanaugh has explained, even if "equitable relief is ordinarily limited to the parties in a specific case[,] . . . in the APA, Congress did in fact depart from that baseline and authorize vacatur." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). In simplest terms: section 705 offers a statutory basis distinct from the Judiciary Act of 1789.

This Court recently endorsed exactly that reasoning in resolving a stay application in *Make the Road New York*. In a statement accompanying the court's order, a majority of the panel explained that "*CASA* does not control the scope of relief available under Section 705" and that section 705 stays by their very nature are not party-specific remedies. 2025 WL 3563313, at *33–36 (statement of Millett and Childs, JJ.). The majority emphasized that "*CASA* is a statutory-interpretation case, and the statute interpreted was the Judiciary Act of 1789"; "*CASA*

is *not* . . . about the scope of relief for agency review authorized by the APA." *Id.* at *34 (emphasis in original). The majority went on to explain that both the text of section 705 and longstanding precedent make clear that stays issued under that provision "operate on the legal source of authority" and thus are not party-limited. *Id.* at *35–36.

To the extent, however, that this order is understood as a preliminary injunction under the Judiciary Act of 1789, and thus subject to *CASA*, the district court should have the opportunity, with the benefit of that ruling, to assess whether the scope of its remedy is necessary to afford complete relief to the plaintiff nonprofits. *See CASA*, 606 U.S. at 851–52. This is particularly relevant given that three Plaintiffs—the National Council of Nonprofits, American Public Health Association, and Main Street Alliance—are membership organizations. As one court of appeals has already concluded since *CASA*, a "list-of-protected people injunction" may be "inadequa[te]" in part because "[r]equiring organizations to share membership lists with Defendants could raise additional constitutional problems regarding the freedom of association and privacy." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 687 (9th Cir. 2025), *stay granted on unspecified grounds*, No. 25A169, 2025 WL

2585637 (Sept. 8, 2025).  (Indeed, some awardees were forced to submit declarations in this case anonymously because they reasonably feared retaliation by Defendants.  *See* D. Ct. Dkt. 24 at 16 n.10.)  Although the government contends (at 48) that "equitable principles" from *CASA* would preclude relief from any of Plaintiffs' members not explicitly identified in district court, *CASA* does no such thing: that decision explicitly declined to address the government's identical argument on that point.  *CASA*, 606 U.S. at 838 n.2.

Elsewhere, the government attacks the scope of relief by complaining (at 39–40) that the order is "opaque" and "lacks the requisite precision" required by Federal Rule of Civil Procedure 65(d).  Not so.  Rule 65 requires only that an order "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  In assessing whether that requirement has been met, this Court does not read the order in a vacuum but instead considers "the circumstances surrounding [the order's] entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent."  *United States v.*

*Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (quotation marks omitted).

The government cannot feign confusion about the terms of the order given the order's clear and specific language barring OMB from reinstituting a sweeping non-individualized freeze on open awards, as well as the broader context, which included the government's own announcement that its "federal funding freeze" continued. *See New York v. Trump*, 133 F.4th 51, 72 (1st Cir. 2025) (rejecting similar objections to materially identical language). To the extent the court's order is considered broad, such "breadth is warranted to prevent further violations where, as here, a proclivity for unlawful conduct has been shown." *Philip Morris*, 566 F.3d at 1137 (quotation marks and brackets omitted). There is also no support in fact or reason for the government's suggestion that the order—which the court entered in February 2025— "threatens to chill OMB from . . . issu[ing] guidance regarding funding priorities." *See supra* Sec. II.C. Indeed, the government points to no example.

Finally, the government expresses (at 47)—for the first time on appeal—skepticism that any of the three membership-organization

Plaintiffs is "a bona fide membership organization." To the extent the Court considers this (waived) argument, *see Flynn*, 269 F.3d at 1068–69, the Court should soundly reject it.

Relying on a single Fifth Circuit case from 1997, the government argues that each of these three Plaintiffs has failed to establish "indicia of membership" sufficient to proceed under a theory of associational standing. But all three have shown that they are traditional voluntary membership organizations, whose members have provided declarations in this case, *see, e.g.*, JA 226–34 (National Council of Nonprofits member), JA 236–39 (American Public Health Association member), JA 248–51 (Main Street Alliance member), and they are established as 501(c)(3) organizations under federal law. Binding precedent holds that nothing more was required, and that the "indicia of membership" test the government invokes does not apply here. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) ("The indicia of membership analysis . . . has no applicability in these cases. Here, SFFA is indisputably a voluntary membership organization with identifiable members . . . ."). "Where, as here, an organization has identified members and represents them in good faith, our cases do not

require further scrutiny into how the organization operates." *Id.* The government does not address—or even acknowledge—this contrary precedent, but it forecloses the government's (waived) argument. And, in any event, because the section 705 stay operates as to the agency action, rather than specific plaintiffs or their members, the question is immaterial.

In sum, the Court can affirm the district court's order as a proper exercise of authority under section 705. But if any confusion remains about the basis for or scope of that order, the appropriate course is not reversal, but remand. The district court itself is best positioned to clarify its order in the first instance. *See CASA*, 606 U.S. at 854; *Doe v. Trump*, 142 F.4th 109, 112 (1st Cir. 2025) (remanding "for the limited purpose of enabling the District Court to consider the bearing, if any, of that guidance in *CASA* on the scope of the preliminary injunction"). To prevent further irreparable harm, the court's order should remain in effect for the pendency of any remand. *See, e.g.*, *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 734 (7th Cir. 2025) (affirming and remanding preliminary injunction without vacating).

## CONCLUSION

For all these reasons, the Court should affirm.

Dated:  December 19, 2025      Respectfully submitted,

*/s/ Jessica Anne Morton*
Jessica Anne Morton
Kevin E. Friedl
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
rthurston@democracyforward.org

## CERTIFICATE OF COMPLIANCE

This document complies with Federal Rule of Appellate Procedure 32(a)(7) because, excluding the portions exempted by Rule 32(f), it contains 12,055 words.

*/s/ Jessica Anne Morton*
Jessica Anne Morton

# ADDENDUM

# TABLE OF CONTENTS

OMB Freeze Order, Memorandum M-25-13……………………………….Add. 1

Excerpts from Feb. 20, 2025 Motion Hearing………………………..Add. 3


January 27, 2025

M-25-13

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:        Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT:     Temporary Pause of Agency Grant, Loan, and Other Financial Assistance
             Programs

      The American people elected Donald J. Trump to be President of the United States and gave him a mandate to increase the impact of every federal taxpayer dollar. In Fiscal Year 2024, of the nearly $10 trillion that the Federal Government spent, more than $3 trillion was Federal financial assistance, such as grants and loans. Career and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities. Financial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending "wokeness" and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve.

      This memorandum requires Federal agencies to identify and review all Federal financial assistance[1] programs and supporting activities consistent with the President's policies and requirements.[2]  For example, during the initial days of his Administration, President Donald J. Trump issued a series of executive orders to protect the American people and safeguard valuable taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20,

---

[1] 2 CFR 200.1 defines Federal financial assistance to mean "[a]ssistance that recipients or subrecipients receive or administer" in various forms, but this term does not include assistance provided directly to individuals. For the purposes of this memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals.
[2] Nothing in this memo should be construed to impact Medicare or Social Security benefits.

2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025). These executive orders ensure that Federal funds are used to support hardworking American families.

To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders. In the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities. The temporary pause will become effective on January 28, 2025, at 5:00 PM. Even before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect. Federal agencies must report this information to OMB along with an analysis of the requirement. OMB also directs Federal agencies to pause all activities associated with open NOFOs, such as conducting merit review panels.

No later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause. Each agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis. To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards (2 CFR 200.344), or recording obligations expressly required by law.

Additionally, agencies must, for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published, and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards.

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3    NATIONAL COUNCIL OF NONPROFITS,
      et al.,
 4                                          Civil Action No.
                     Plaintiffs,           1:25-cv-0239
 5
         vs.                               Washington, DC
 6                                         February 20, 2025
      OFFICE OF MANAGEMENT AND BUDGET,
 7    et al.,
                                           11:06 a.m.
 8                   Defendants.
      _____/
 9

10                  TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE LOREN L. ALIKHAN
11                   UNITED STATES DISTRICT JUDGE

12

      APPEARANCES:
13
      For the Plaintiffs:      KEVIN FRIEDL
14                             JESSICA MORTON
                               ROBIN THURSTON
15                                Democracy Forward Foundation
                                  P.O. Box 34553
16                                Washington, DC 20043

17
      For the Defendants:      DANIEL SCHWEI
18                             EITAN SIRKOVICH
                               ANDREW FREIDAH
19                                U.S. Department of Justice
                                  P.O. Box 883
20                                Washington, DC 20044

21

22


23    Court Reporter:          JEFF HOOK
                                  Official Court Reporter
24                                U.S. District & Bankruptcy Courts
                                  333 Constitution Avenue, NW
25                                Washington, DC 20001
```

P R O C E E D I N G S

**DEPUTY CLERK:** We're now on the record for National Council of Nonprofits, et al., vs. Office of Management and Budget, et al.; civil action 25-cv-239.

Counsel, please come forward and note your appearance for the record, beginning with plaintiffs' counsel.

**MR. FRIEDL:** Good morning, Your Honor. May it please the Court, Kevin Friedl for the plaintiffs. I'm joined by Jessica Morton and Robin Thurston, also representing all plaintiffs.

**THE COURT:** Good morning.

**MR. SCHWEI:** Good morning, Your Honor. Daniel Schwei from the Department of Justice on behalf of the United States. I'm joined at counsel table by Eitan Sirkovich and Andrew Freidah, also from the Department of Justice.

**THE COURT:** Good morning. So we are here today for the hearing on the preliminary injunction motion that plaintiffs have filed. I will note we are audio streaming this, both through the public line and in the media office.

So I will begin by hearing from plaintiffs, because it is their motion.

**MR. FRIEDL:** Thank you, Your Honor. Plaintiffs' motion for a preliminary injunction obviously asks the Court

1    We would have to identify them and unfreeze funds as to only

2    them.  It seems inconsistent with the approach they've taken

3    of freezing funding portals which necessarily cuts off

4    access to everyone.  They would have to, I guess, put those

5    back online, do this individualized review.  I think that

6    both the law and the facts here suggest that relief should

7    not be limited to the plaintiffs, but apply more broadly.

8         **THE COURT:**  And my reading of Section 705 of the

9    APA is that the stay -- if there's a stay during

10   proceedings, it is of the agency action and so it does apply

11   across the board.  But I don't see you relying on 705 in

12   your briefing.

13        Did I just miss that or do you think that you

14   would be entitled to sort of across-the-board relief just

15   under the basic PI standard?

16        **MR. FRIEDL:**  We do think we would be entitled to

17   across-the-board relief under the PI standard.  We did not

18   specifically ask for a stay under 705.  My understanding is

19   the same as Your Honor's, that a Section 705 stay operates

20   on the action itself and isn't specific to defendants or

21   plaintiffs.  I think that if the Court thought that that

22   were a more appropriate means to provide the same relief

23   that we ask for here, it would be appropriate to order that

24   the same factors govern applying 705 stays as preliminary

25   injunctions.  And so we would certainly have no objection to

1  that if, in Your Honor's view, that was the sort of more

2  appropriate mechanism to address the request for relief

3  here.

4      THE COURT:  I did have one more question, if I can

5  find it in my notes.  Oh, so when we first were here on the

6  administrative stay and again on the TRO, all we were

7  focused on was the disbursement of monies under open awards.

8      Is that still your position or are you seeking a

9  PI as it goes to the NOFOs or sort of other aspects of the

10  memo?

11      MR. FRIEDL:  That is still our position, Your

12  Honor.  We're still requesting relief sort of within the

13  bounds originally described at the TRO stage, so for open

14  awards.

15      THE COURT:  All right, thank you very much.

16      MR. FRIEDL:  Thank you.

17      THE COURT:  Mr. Schwei.

18      MR. SCHWEI:  Thank you, Your Honor.  This case is

19  about a challenge to OMB memo 25-13 that was rescinded weeks

20  ago.  And unlike the last time we were here, plaintiffs now

21  agree that the funding that they would receive under their

22  grant awards is available to them.  And they say that

23  there's still a need for continued preliminary relief from

24  this Court, but that is an inherently speculative

25  proposition.  Their claim is that if OMB were to

1  credited sort of the two or four or five declarations that

2  plaintiffs have submitted, that is -- it would be shocking

3  if four -- if a burden on four entities' expressive activity

4  could justify continued nationwide invalidation of an entire

5  agency policy promulgated by the executive branch.  At most,

6  it would justify relief as to those individual people's

7  continued funding based on their expressive activity and

8  concerns.

9       I'm happy to turn to scope of relief directly.

10      **THE COURT:**  Yeah, so on scope of relief, I mean,

11 what do you make of the fact that the APA allows for a stay

12 of the agency action as opposed to a stay as it applies to

13 particular plaintiffs?

14      **MR. SCHWEI:**  So a few responses.  One is that

15 although the D.C. Circuit has sort of embraced the concept

16 of vacatur of agency actions, the Department of Justice

17 disagrees with those decisions.  And so just preserving our

18 bottom line position, that universal vacatur under the APA

19 is not an appropriate remedy -- although I recognize the

20 D.C. Circuit has said otherwise.

21      In the particular case talking about vacatur of

22 regulations that my friends rely on -- I think it's the

23 National Mining Association case, that case talks about a

24 facial challenge to the regulations, and distinguishes other

25 courts of appeals' decision -- or at least one other court

of appeals' decision as not involving a facial challenge to
the regulation.  So I think in order to get the relief they
want, they would, at a minimum, have to show success on a
facial challenge.

But even if 705 were the right remedy here, it
could only operate on memorandum 25-13.  It could not
possibly serve as the source of authority for the additional
terms in injunctive form that the plaintiffs request, which
is enjoining the hypothetical future pauses; namely,
implementing or reiterating the OMB memo under any other
name.  And again, I'm paraphrasing rather than quoting the
court's exact language.  But that particular provision is
problematic and I don't think can be justified only by 705.

**THE COURT:**  If you could turn to your request for
a bond.  I've spent most of my career in the executive
branch, and I've not seen a request from the executive
branch for a bond before.

**MR. SCHWEI:**  I've personally have done it at least
once before in a case before Judge Nichols.  It was the
original TikTok litigation.  I forget the case number, I
believe it was TikTok v. Trump.  But Judge Nichols denied a
bond there saying that the national security harms claimed
by the government were not reasonably capable of
monetization.  Here, I think the harms are capable of
monetization, because we're, at the end of the day, talking

1          **THE COURT:**  Mr. Friedl.

2          **MR. FRIEDL:**  Your Honor, I want to start with a

3     slight correction or clarification.  With respect to Section

4     705, I think I correctly said that that wasn't something we

5     specifically addressed in our brief.  We did invoke it in

6     the proposed order that we submitted where we asked for

7     relief to be granted to the maximum extent allowed by that

8     provision.  And as I said, I think the fact that it wasn't

9     specifically discussed in the motions is of no consequence,

10    because it's the same standard that applies for granting a

11    705 stay.

12          My colleague --

13          **THE COURT:**  Do you agree with your friend on the

14    other side that actually even if I were to invoke 705, that

15    wouldn't grant you the relief that you're fully requesting,

16    because that would just be to maintain the pause on the

17    memo?

18          **MR. FRIEDL:**  Well, so I do not have the

19    language -- exact language of 705 in front of me.  My memory

20    is that it speaks of agency action.  And I think that the

21    way we envision this is we have come to court to challenge

22    the freeze ordered by OMB, not the piece of paper that it

23    was issued on.  So we think that action continued to be

24    implemented and carried out after the administrative stay,

25    after the rescission and right up until this Court entered a

1    TRO.  So I think, to my mind, 705 would be an appropriate
2    way of addressing that.  It also would be appropriate, I
3    think, to order relief under a 705 stay as well as a
4    preliminary injunction to ensure that this Court's order has
5    appropriate effect.
6            I also wanted to address my colleague's insistence
7    that it's entirely speculative that any harms are going to
8    flow in the absence of preliminary relief.  That's just
9    completely contrary to the record for all the reasons that
10   we've discussed already today and two weeks ago.  We have as
11   clear of an admission of voluntary cessation as you're
12   likely to ever see from the government in the form of the
13   White House press secretary's statement.  You have the
14   statements of the EPA and the NSF that openly acknowledge
15   they were carrying out the order.  I won't recite everything
16   here, just to say that the Court already addressed this.
17   And we think those factors remain relevant.  The fact that
18   they've changed their conduct because of the TRO doesn't
19   sort of eliminate that same risk of voluntary cessation.
20           And on FEMA in particular, we think that's
21   relevant.  We're not saying necessarily that that -- I have
22   not suggested, and we don't mean to suggest at this time,
23   that that violates the court order.  But what I think it
24   does show is this continuing interest in pursuing a freeze
25   first, ask questions later policy.  And that's relevant,

1          **THE COURT:**  Thank you to both parties for their

2   briefing and their argument.  The TRO will remain in place,

3   and I will issue my preliminary injunction ruling in due

4   course.  Thank you.  This matter is adjourned.

5       (Proceedings adjourned at 12:32 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**C E R T I F I C A T E**

2

3            I, **Jeff M. Hook, Official Court Reporter,**

4     certify that the foregoing is a true and correct transcript

5     of the record of proceedings in the above-entitled matter.

6

7

8

9     <u>February 21, 2025</u>                              _____

10              **DATE**                                    **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25