**ORAL ARGUMENT SCHEDULED FEBRUARY 6, 2026**

**No. 25-5148**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL COUNCIL OF NONPROFITS, et al.,

Plaintiffs-Appellees,

v.

OFFICE OF MANAGEMENT AND BUDGET, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY .......... 1

ARGUMENT .......... 2

I. This Case Is Moot .......... 2

II. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims .......... 7

A. Plaintiffs Misconstrue the OMB Memorandum .......... 8

B. OMB's Issuance of the Memorandum Did Not Violate the APA .......... 11

III. The District Court's Injunction Was Erroneous in Any Event .......... 19

A. The Equities Did Not Warrant Preliminary Relief .......... 19

B. The District Court's Universal Injunction Was Impermissible .......... 24

CONCLUSION .......... 31

CERTIFICATE OF COMPLIANCE

**TABLE OF AUTHORITIES**

**Cases:** **Page(s)**

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................. 10

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .................................................................................. 22

*Federal Energy Regul. Comm'n v. Electric Power Supply Ass'n*,
577 U.S. 260 (2016) .................................................................................. 18

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................. 24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................................... 4

*June Med. Servs., LLC v. Phillips*,
22 F.4th 512 (5th Cir. 2022) .............................................................. 30, 31

*Lujan v. G & G Fire Sprinklers, Inc.*,
532 U.S. 189 (2001) .................................................................................. 23

*Make the Rd. N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .......... 24, 25, 26, 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................... 17

*Public Citizen, Inc. v. OMB*,
598 F.3d 865 (D.C. Cir. 2010) .................................................................. 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ...................................................................................... 7

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .............................................................................. 28, 29

*Trump v. American Fed'n of Gov't Emps.*,
145 S. Ct. 2635 (2025) ........................................................................ 11, 15

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 25, 28

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 22

*Yee v. City of Escondido*,
503 U.S. 519 (1992) ........ 23

**Statutes:**

Administrative Procedure Act,
5 U.S.C. § 705 ........ 24

31 U.S.C. § 501 ........ 13

31 U.S.C. § 503 ........ 14

31 U.S.C. § 503(a)(2) ........ 12

31 U.S.C. § 6307 ........ 14

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| OMB | Office of Management and Budget |

## INTRODUCTION AND SUMMARY

Plaintiffs' brief is premised on a set of irreconcilable assertions. Although the Office of Management and Budget (OMB) Memorandum at issue was rescinded, plaintiffs assert that the case is not moot because the government's conduct may recur. However, they attack the Memorandum primarily on the ground that it inadequately considered reliance interests and provided inadequate notice or time to consider how to implement its directives. It is illogical to think that this sort of fact-bound controversy would arise again when any hypothetical future agency action in this area—even assuming such action will occur—would come with new context, new consideration, new explanation, new notice, and new timeframes. That was true at the time the district court ruled, and it is even more clearly true a year into the Administration.

Plaintiffs' case-specific merits arguments could at most have justified precluding the government from applying the rescinded Memorandum to plaintiffs—an exercise which would have been pointless but relatively harmless. Yet the district court instead went further and issued a vague injunction that prohibits the government from issuing directives in the future that the court deems sufficiently similar to the Memorandum that gave rise

to this litigation. That relief was plainly improper, and plaintiffs cannot plausibly defend an injunction that extends beyond the Memorandum itself by recasting it as merely staying the Memorandum's effective date.

These procedural points demonstrate that no injunction should have issued. But plaintiffs' merits arguments are in any event mistaken on their own terms. Even for the short period that the Memorandum was in effect, it reflected a routine and lawful direction to agencies to pause certain funding where legally permissible to assess consistency with Administration priorities as expressed in contemporaneous Executive Orders that plaintiffs have not challenged here. Plaintiffs are forced to resort to a distorted characterization of the Memorandum in seeking to demonstrate a likelihood of success on their claims. And they fare no better in suggesting that OMB lacks authority to provide direction to federal agencies on budgetary issues. The preliminary injunction should be vacated.

## ARGUMENT

### I. This Case Is Moot

The OMB Memorandum that plaintiffs challenge was in effect for two days and was rescinded nearly a year ago, before the district court issued its preliminary injunction. Plaintiffs' claims were thus moot at that time and are

even more clearly moot now. Plaintiffs do not claim that they can obtain effective relief against the Memorandum that is no longer in effect. Instead, when plaintiffs finally address this threshold jurisdictional issue (Br. 42-49), they simply repeat the district court's erroneous conclusions—now almost a year old—that the government's "illegal conduct" never ended and that their claims are saved by the voluntary-cessation exception to mootness. Neither contention is persuasive.

Despite plaintiffs' references to "OMB's purported rescission" and their contentions that "the funding freeze continued," Br. 43, it is undisputed that OMB in fact rescinded the Memorandum, J.A. 69 ("OMB Memorandum M-25-13 is rescinded."). That rescission plainly ended the conduct that plaintiffs challenge—namely, the issuance of the Memorandum itself.

As the government has explained, Gov't Br. 15-16, it is both unsurprising and irrelevant that some federal agencies continued to freeze certain funds after the OMB Memorandum's rescission. The President had issued multiple Executive Orders that remained in effect and that directed the temporary freezing of specified funds. Even beyond those Executive Orders, agencies did not need any express directive from the President or OMB to determine, in the midst of a transition between Administrations

during which the President had made a series of policy announcements that sharply deviated from his predecessor, that it would be appropriate to pause implementation of previous funding decisions pending review for consistency with the new Administration's policy priorities.

Plaintiffs do not (and could not properly) challenge the Executive Orders or some amorphous "funding freeze." Nor do plaintiffs challenge any particular agency's decision to pause any particular funding stream. Instead, plaintiffs' claims—which are brought only against OMB and the Director of OMB—are limited to challenging the OMB Memorandum. *See* J.A. 27-30 (claiming that the "OMB Order is arbitrary and capricious," that OMB "Memo M-25-13" violates the First Amendment, and that "OMB's action" in issuing the Memorandum was "in excess of its statutory authority").

The rescission of that Memorandum moots plaintiffs' claims, and the voluntary-cessation exception has no application where, as here, the challenged conduct "could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). Plaintiffs purport to accept the relevant standard, but they do not and cannot explain how a Memorandum issued at the beginning of a presidential administration to pause funding to allow time to assess

whether it comports with the new President's priorities could reasonably be expected to be reissued later in the administration. *See* Gov't Br. 14-16.

That gap in plaintiffs' logic is all the more glaring given that their merits arguments are intensely focused on the specific circumstances in which the OMB Memorandum was issued, including the ostensible lack of sufficient time for federal agencies and funding recipients to react and adjust to the Memorandum. *See, e.g.*, Br. 33 ("agencies had no practical ability to give it effect in the single day they had to shut off the flow of trillions of dollars in federal funding"); Br. 34 ("impossibly short turnaround"); Br. 37 (government should have considered "providing more time for agencies to implement the order and for recipients to prepare"). None of that can reasonably be expected to recur.

Rather than provide any reason to believe that OMB might issue a materially identical Memorandum in the future, plaintiffs retreat to generalities. They argue (Br. 46-47) that OMB has demonstrated a "keen[ness] to resume funding freezes" by pointing to OMB's announcement of a pause of certain specific funding streams during the recent lapse in appropriations. But plaintiffs' illustrations only underscore why their claims are moot. A brief challenging one of those pauses would look nothing like

plaintiffs' brief here, and plaintiffs rightly have not contended that the district court's injunction here—which prohibits reinstating the challenged Memorandum in another form—would properly extend to the pauses related to the lapse in appropriations. Those are new decisions that must be challenged, if at all, when a ripe dispute materializes.

Plaintiffs double down on their errors when they contend (Br. 49) that "there is no basis to assume" that any future OMB action would include "a more reasoned explanation." Whether plaintiffs' claims are moot does not turn on whether some hypothetical, different agency action would comport with the requirements of the Administrative Procedure Act (APA). Instead, the relevant point is that the analysis of a hypothetical future action would necessarily turn on the specific explanation for, and the specific context of, that action—not on whether the rescinded OMB Memorandum was reasonably explained a year ago. There is thus no reasonable possibility that the same dispute presented by this case is likely to recur.

Plaintiffs cite no authority to support the proposition (Br. 47) that this Court may properly "affirm the grant of preliminary relief" and remand "for the district court to evaluate the relevant facts in the first instance" while harboring "doubts" about the courts' continuing jurisdiction over this case.

*Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). And regardless, it is clear for the reasons explained that plaintiffs' claims—or, at the absolute least, plaintiffs' request for preliminary relief—are moot and that there is no reasonable possibility that the same dispute will arise in the future. Additional factual development is thus unwarranted.

## II. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

Even when it was in effect, the OMB Memorandum simply instructed agencies, where legally permitted, to temporarily pause certain federal funding to assess its consistency with the President's policy priorities as expressed in several Executive Orders issued at the beginning of the new Administration. *See* Gov't Br. 18-20. Plaintiffs do not take issue (Br. 39-40) with the notion that the President may direct his subordinates to take actions to implement his agenda pursuant to the agencies' authority under their organic statutes and regulations. That was all the OMB Memorandum sought to accomplish. And plaintiffs' alternative argument that OMB lacks authority to provide such direction cannot be reconciled with OMB's governing statute and with OMB's traditional and longstanding role in the Executive Branch.

### A. Plaintiffs Misconstrue the OMB Memorandum

Plaintiffs' claims all stem from a serious misapprehension of the OMB Memorandum. Like the district court, plaintiffs strive to read the Memorandum in the broadest possible fashion and then assert that, under their implausibly broad construction, the Memorandum was unlawful. As noted above, even if that were correct, it would merely underscore that the controversy to which the Memorandum gave rise cannot reasonably be expected to recur. But in any event, that mode of analysis is flawed, and it cannot be squared with the Memorandum's express language.

Plaintiffs lack support for their premise (Br. 19-21) that the OMB Memorandum called for indiscriminately pausing all federal financial assistance, irrespective of whether that funding jeopardized the President's policy priorities. To the contrary, the Memorandum emphasized that federal spending "should be dedicated to advancing Administration priorities" and should be aligned "with the will of the American people as expressed through Presidential priorities." OMB Mem. 1. The Memorandum went on to list "a series of executive orders" that seek to "ensure that Federal funds are used to support hardworking American families." *Id.* at 1-2. And the Memorandum indicated in multiple places that agencies should pause

funding "that may be implicated by the executive orders." *Id.* at 2. Finally, the Memorandum expressly and repeatedly incorporated the limitation that agencies should effect pauses only "to the extent permissible by law." *Id.*

Plaintiffs assign (Br. 22-23) talismanic significance to the comma in one sentence providing that agencies should "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders." OMB Mem. 2 (emphasis omitted). According to plaintiffs, that comma signifies that OMB wanted agencies to halt all funding even if it had nothing to do with any of the Executive Orders described throughout the Memorandum. That hypertechnical distinction makes little sense. After all, the whole point of the endeavor was to identify discretionary funding streams that appeared to be good candidates for the new Administration to reallocate to different uses, with the goal of enabling a more comprehensive review and determination in consultation with OMB about the ultimate disposition of those funds. *See* Gov't Br. 18-19.

Even if there had been any lingering doubt about the scope of the Memorandum, OMB issued guidance one day later stating in bold typeface that "[a]ny program not implicated by the President's Executive Orders is

not subject to the pause." J.A. 62; *see id.* (reiterating that the contemplated pause was "expressly limited to programs, projects, and activities implicated by the President's Executive Orders"). Plaintiffs err in summarily dismissing OMB's contemporaneous understanding of its own memorandum as "plainly erroneous or inconsistent with" their maximalist interpretation. Br. 25-26 (quotation omitted). Courts do not casually cast aside this sort of informative agency guidance or declare challenged actions illegal when they can be construed in a permissible manner. *Cf. Arizona v. United States*, 567 U.S. 387, 415 (2012) (noting that "it would be inappropriate to assume" that state law "will be construed in a way that creates a conflict with federal law").

Plaintiffs' other efforts (Br. 25-27) to manufacture a conflict between the OMB Memorandum and guidance likewise fall flat. Plaintiffs question whether the guidance's exceptions for programs benefiting "small businesses" and "farmers" and "other similar programs," J.A. 63, derive from the Memorandum. But in addition to explicitly excluding "Medicare" and "Social Security benefits," OMB Mem. 1 n.2, the Memorandum noted that federal financial assistance did not "include assistance provided directly to individuals," *id.* at 1 n.1, and further stated that agencies must "identify any legally mandated actions or deadlines for assistance programs," *id.* at 2.

The guidance merely elaborated on the exceptions specifically provided for in the Memorandum itself.

Plaintiffs fare no better (Br. 21-22, 27-28) in focusing on how various agencies approached implementation. As plaintiffs elsewhere admit (Br. 39), this case does not involve a challenge to any follow-on agency decision to freeze funds; instead, the agency action at issue is the now-rescinded OMB Memorandum. Thus, the proper focus is on the directives that were contained in that Memorandum. *See Trump v. American Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (conceiving of a challenge to an "Executive Order and Memorandum" ordering agencies to create certain reorganization plans as independent from a challenge to the reorganization plans themselves). Plaintiffs' overreading of the Memorandum infects their assertions that the Memorandum was likely unlawful.

### B. OMB's Issuance of the Memorandum Did Not Violate the APA

On appeal, plaintiffs do not renew (Br. 15, 28-29) their misguided argument that the OMB Memorandum violated the First Amendment. *See* Gov't Br. 34-38. Instead, plaintiffs contend (Br. 29-41) that the Memorandum exceeded OMB's statutory authority and was arbitrary and capricious. Those contentions lack merit.

1. Plaintiffs do nothing to rehabilitate the district court's erroneous conclusion that OMB lacked statutory authority to issue the Memorandum. Plaintiffs do not dispute (Br. 39) that the President may direct his subordinates in the Executive Branch to exercise their discretion over funding within the confines of applicable statutes and regulations. Nor do they dispute (Br. 39) OMB's concomitant duty to provide "overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements." 31 U.S.C. § 503(a)(2). Here, OMB served in that traditional role of supervising and guiding agency funding determinations to ensure compliance with the President's funding-related directives as reflected in a set of Executive Orders. *See* Gov't Br. 25-30.

Plaintiffs largely ignore that OMB was not purporting to exercise any authority to regulate the public, but was instead providing guidance to federal agencies, who would then decide how best to exercise their own authorities in light of the underlying Executive Orders and OMB's guidance. To the extent plaintiffs believe that implementing agencies misconstrued their authority to pause various funding streams, such challenges would be properly directed at the implementing agencies who would allegedly be

acting beyond their authority (which OMB did not purport to construe, instead directing agencies to act consistent with law). Rather than addressing any issue of the government's authority to act, plaintiffs' statutory argument instead attempts to insert the judiciary into the affairs of the Executive Branch by having courts tell federal agencies which directives from OMB they should or should not follow. And on the merits, their argument that OMB should not issue directives to federal agencies on financial-management issues is difficult to square with the text of OMB's organic statute, reproduced above, or with the traditional and longstanding understanding of OMB's role within the Executive Branch.

At various points (Br. 39, 41), plaintiffs suggest that the President's (uncontested) authority to issue funding-related directives is irrelevant. Not only is OMB housed in the Executive Office of the President, 31 U.S.C. § 501, but the President's Executive Orders form the backdrop against which OMB issued the Memorandum that plaintiffs challenged. That context is especially illuminating where, as here, OMB was acting to "ensur[e]" that "policies prepared by other federal agencies are consistent with Administration policy." *Public Citizen, Inc. v. OMB*, 598 F.3d 865, 867 (D.C. Cir. 2010). OMB did not need special statutory authority to issue the Memorandum

advising agencies on the implementation of the Executive Orders. Regardless, the Memorandum fell well within OMB's broad statutory authority to establish policies for, and promote consistency and efficiency in, the Executive Branch's financial management, as well as OMB's long-held responsibility for supervising the President's budgetary resources and counseling agencies on various matters. *See* 31 U.S.C. §§ 503, 6307.

The remainder of plaintiffs' statutory-authority arguments largely rehash their mistaken views about the breadth of the OMB Memorandum. They incorrectly assert (Br. 39) that the Memorandum directed "the near-immediate, government-wide halt of nearly all federal financial assistance." They wrongly claim (Br. 40-41) that the Memorandum "went far beyond" implementing the "instructions to freeze funding that were contained in certain executive orders." And they again seek to conflate (Br. 41) the Memorandum's internal instructions to agencies with the actions taken by those agencies. None of those points undermines OMB's authority to act in the circumstances that gave rise to this case.

2. Although plaintiffs' fact-specific arbitrary-and-capricious challenge is particularly unlikely to recur, the OMB Memorandum was reasonable and reasonably explained in any event. The Memorandum reflected that

agencies were responsible for determining which funding streams to pause. It permitted agencies to request exemptions and directed agencies to implement the Memorandum's directions only "to the extent permissible by law." OMB Mem. 2. That instruction necessarily required agencies to evaluate whether pausing funding was appropriate in particular circumstances—or, conversely, whether legal constraints or factors such as reliance interests militated in favor of continued funding. That devolution of authority to agencies was eminently reasonable. *See* Gov't Br. 31-34.

Plaintiffs err in discounting (Br. 32) this important feature of the OMB Memorandum as a "boilerplate caveat." In analogous circumstances, the Supreme Court granted a stay of a preliminary injunction entered against implementation of an Executive Order and a joint OMB and Office of Personnel Management memorandum directing agencies, where legally permitted, to develop certain reorganization plans. Although the Supreme Court "express[ed] no view on the legality of" any specific reorganization plans, which were "not before th[e] Court," the Court concluded that "the Executive Order and Memorandum" were likely "lawful." *Trump*, 145 S. Ct. at 2635. Justice Sotomayor's concurrence explained that "the relevant Executive Order directs agencies to plan reorganizations and reductions in

force 'consistent with applicable law'" and the memorandum "reiterates as much." *Id.* (Sotomayor, J., concurring in the grant of stay). The materially similar constraints in the Memorandum undercut plaintiffs' claims here.

Plaintiffs also dismiss (Br. 33) the various carveouts and limitations of the OMB Memorandum because, in their view, "agencies had no practical ability to give [them] effect." For example, plaintiffs claim (Br. 34) that the agencies had an "impossibly short turnaround" to request "exceptions on a case-by-case basis." But OMB's guidance reflects that OMB "worked with agencies" and "approved many programs to continue even before the pause" took effect. J.A. 62. Plaintiffs dismiss (Br. 34 n.1) that statement as unsupported by "evidence"—beyond, apparently, the OMB guidance, which is in the record, *see* J.A. 62, and which reflects OMB's statements about its own past actions—but nowhere develop any contention that it is untrue. Regardless, plaintiffs disregard that agencies have dedicated personnel responsible for administering grant and funding programs. It is eminently sensible to expect that those employees could draw on their deep knowledge and expertise to make quick judgments about which payments are discretionary and potentially contrary to new presidential priorities.

Plaintiffs' arguments are no more persuasive when they actually focus on the OMB Memorandum's reasoning. Plaintiffs contend (Br. 31-32) that the Memorandum did not "provid[e] a reasoned explanation" for the choice to pause funding while the Executive Branch conducted its review rather than allowing funding to keep "flow[ing]" while that review was ongoing. As the government has explained, the basis for directing a pause pending further review is evident: because substantial federal funds are expended every day, the pause was necessary to prevent funds inconsistent with the President's priorities from being irretrievably expended in the interim. *See* Gov't Br. 31.

Plaintiffs appear to suggest (Br. 31) that that rationale did not appear in the OMB Memorandum. But the Memorandum noted the extremely large volume of federal spending totaling more than "$3 trillion" annually, *see* OMB Mem. 1, and articulated its objectives of "safeguard[ing] valuable taxpayer resources" while "determin[ing] the best uses of the funding for" federal programs "consistent with the law and the President's priorities," *id.* at 1-2. Based on that explanation, OMB's path could "reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Indeed, the

Supreme Court has accepted, under that standard, explanations "of less than ideal clarity." *Id.* (quotation omitted).

By much the same token, plaintiffs' discussion of alternatives is equally unpersuasive. They assert that (Br. 37) the government could have "cabin[ed] the freeze to new awards" or could have "provid[ed] more time" before putting a pause into effect. As a preliminary matter, the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Federal Energy Regul. Comm'n v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Regardless, OMB here fully justified its decision as implementing the President's Executive Orders and as preventing the "waste of taxpayer dollars" through expenditures that did "not improve the day-to-day lives of those we serve." OMB Mem. 1.

Plaintiffs likewise err in contending (Br. 35-37) that OMB entirely failed to consider the practical consequences and recipients' reliance interests. The Memorandum addressed those circumstances where the effects would be most acute, including by exempting direct assistance to individuals, payments required by law, and payments that agencies believed should continue in particular situations based on reliance interests or some other reason. *See* Gov't Br. 31-32. Although plaintiffs may believe that those

exceptions were insufficient (Br. 35-36), the Memorandum struck an appropriate balance between competing interests by minimizing the negative consequences while simultaneously protecting the public fisc. That reasoned consideration is all that the APA requires.

## III. The District Court's Injunction Was Erroneous in Any Event

Even if plaintiffs could identify a live claim against the rescinded OMB Memorandum for which they are likely to succeed on the merits, the district court's preliminary injunction was improper. The equities did not support entering that relief. And, in any event, the district court's universal injunction stretches beyond the court's equitable authority.

### A. The Equities Did Not Warrant Preliminary Relief

The district court's injunction prohibits the government defendants from "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in" the rescinded OMB Memorandum. J.A. 354. Even if plaintiffs were correct on the merits here, there would be no basis for enjoining hypothetical future government actions, and doing so threatens harm to the government and the public. Plaintiffs do not seriously contend that every OMB directive to temporarily pause funding would be unlawful, nor have plaintiffs established any

statutory or regulatory entitlement to have decisions on such pauses made on an "individualized" basis—rather than, for example, at the program, subagency, or agency level. Enjoining OMB from carrying out the President's lawful directives to pause and reassess funding is contrary to the public interest. And that harm is only compounded by the likely irreversible nature of the distribution of grant funds.

Plaintiffs barely dispute those practical realities. Instead, they contend (Br. 52) that the government's arguments are "directly inconsistent" with the government's arguments regarding mootness. This contention conflates the question whether plaintiffs suffer a continuing harm from the OMB Memorandum with the question whether the district court's injunction, which extends beyond that Memorandum itself, imposes a harm on the government. It is plaintiffs whose position is inconsistent, simultaneously premising their merits arguments on the unique circumstances of the OMB Memorandum and insisting that an injunction extending beyond those circumstances is appropriate. These points underscore that any injunction should, at an absolute minimum, be limited to a Memorandum issued in materially similar circumstances.

But the district court's injunction is not self-evidently limited to the narrow circumstances that gave rise to this case. Instead, it prohibits the government defendants from "giving effect to" or "reinstating under a different name" the "unilateral, non-individualized directives in" the rescinded OMB Memorandum. J.A. 354. If nothing else, those instructions provide plaintiffs an opening to challenge future actions by OMB whenever they think that those actions are too similar to the Memorandum—and may thus chill OMB from taking legally permitted actions to issue future guidance regarding funding priorities. *See* Gov't Br. 39-40. Any effect the injunction does have would interfere with the Executive Branch's discretion and result in the outlay of funds, thereby harming the government and the public.

Plaintiffs discount (Br. 52) the government's and the public's interests by asserting that there can be no interest in unlawful agency action. Again, plaintiffs fail to appreciate that the preliminary injunction goes beyond enjoining the OMB Memorandum that the district court concluded was likely unlawful. By enjoining the government from adopting some unknowable category of sufficiently similar directives in the future, the district court has done more than prohibit the unlawful agency action in which plaintiffs claim there is no public or legitimate government interest.

More generally, Supreme Court precedent requires that plaintiffs demonstrate not only that they are "likely to succeed on the merits" but also that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs' reasoning would improperly collapse the inquiry. *See id.* at 31-32 (declining to "address the underlying merits" but holding the plaintiffs had failed to meet the equitable factors). Courts separately assess the equitable factors even at final judgment, when a court's conclusion regarding a defendant's illegal action is final rather than—as at the preliminary relief stage—only tentative. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006) (rejecting "invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination" that a defendant acted illegally).

With respect to their own asserted harms, plaintiffs do not dispute as a factual matter that their asserted harms ultimately stem from their inability to access funds. Nor do they dispute that monetary damages would be available in a proper suit in the proper venue if the government breached any obligation requiring disbursement of particular funds on particular timelines. Contrary to plaintiffs' contentions about forfeiture (Br. 50), the government

contended in district court that plaintiffs could not demonstrate irreparable harm warranting an injunction in this suit. *See* Dkt. No. 47, at 37-38. The government is free to "make any argument in support of" that contention and is "not limited to the precise arguments [it] made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

Plaintiffs claim (Br. 50) that the injuries they will suffer from loss of funding in the meantime could not be fully remediated by damages after the fact. But any entitlement to specific funds on specific timelines necessary to alleviate those harms would necessarily be based on some (as yet unidentified) right to payment. As the Supreme Court has made clear in a related context, the "standard practice in breach-of-contract suits is to award damages, if appropriate, only at the conclusion of the case," notwithstanding any complaint that such a remedy "is inadequate" to alleviate present harms. *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 197 (2001). Plaintiffs also suggest that the lack of government funding "make[s] it more difficult for [them] to accomplish their primary mission." Br. 50 (quotation omitted). But the Supreme Court has more recently made clear that such abstract mission-based injuries are insufficient even to confer Article III standing, much less

to serve as the basis for irreparable harm. *See Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 393-95 (2024).

### B. The District Court's Universal Injunction Was Impermissible

Regardless, the district court's preliminary injunction is impermissibly broad because it provides relief that extends beyond plaintiffs. Plaintiffs' primary defense is (Br. 53-56) that the district court entered a stay of the OMB Memorandum under 5 U.S.C. § 705—rather than an injunction—and that such stays may permissibly operate universally. That argument is wrong on both counts.

The district court's relief operates in no way like a permissible § 705 stay. That provision provides that a reviewing court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. As plaintiffs do not dispute, the defining feature of appropriate § 705 relief is that it does no more than postpone, or stay, the challenged action. Thus, a § 705 stay "simply suspends the legal source of authority to act" rather than (as an injunction might) "direct[ing] individuals to act or not to act." *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL

3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett & Childs, JJ.) (alterations and quotation omitted).

But the district court's relief here speaks not in terms of suspending the OMB Memorandum (which was, in any event, already rescinded) but instead in terms of compelling defendants to act and not act in various ways, on pain of contempt. The order forbids defendants "from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards"; it requires defendants to "provide written notice of the court's *preliminary injunction*" to various agencies; and it requires defendants to instruct "agencies to continue releasing any disbursements on open awards that were paused due to [the] OMB Memorandum." J.A. 354 (emphasis added). Thus, the preliminary injunction compels and restrains agency action throughout, and it must comport with the principles of equity as described in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

Plaintiffs cannot reimagine (Br. 54) the district court's order as reflecting "nothing more than a statement of the natural consequence of staying the" OMB Memorandum. Plaintiffs do not even attempt to explain

how the court's orders regarding notice and disbursement of payments could reflect the "natural consequence" of a proper stay. And even as to the portion of the injunction regarding implementing, giving effect to, or reinstating the directives in the Memorandum, forbidding the agency from taking future actions that are similar to the Memorandum is not a "natural consequence" of postponing the Memorandum's effective date. Staying the Memorandum would merely amount to prohibiting the government from giving effect to the Memorandum itself—which would be erroneous but harmless, since the Memorandum had been rescinded. That is fundamental to the notion of a stay, which operates on the challenged action itself rather than on the defendants, may not be enforced through contempt, and would not prohibit a subsequent similar action if the agency were able to address all the problems identified in the district court's order. *See Make the Rd. N.Y.*, 2025 WL 3563313, at *16 (statement of Millett & Childs, JJ.).

Moreover, even if the district court had entered a § 705 stay, that stay would still properly be limited to redressing plaintiffs' irreparable harm. In contending otherwise, plaintiffs nowhere engage with the government's arguments regarding how best to interpret that provision, particularly in light of *CASA*'s explication of traditional equitable constraints. *See* Gov't

Br. 45-46. Instead, plaintiffs argue (Br. 54-55) that *CASA* "specifically did not address the scope of relief under the APA." The Supreme Court's decision not to address that question, however, cannot provide affirmative support to plaintiffs' construction of that statute. Similarly, plaintiffs' unelaborated references (Br. 56) to "the text of section 705 and longstanding precedent" provide no firm basis for accepting the remarkable proposition that the APA not only permits but compels such a stark break from the traditional equitable principles recited in *CASA*.

Finally, plaintiffs briefly reference (Br. 55-56) a recent statement attached to a stay order of this Court, which concluded that the government was unlikely to succeed on an argument that a § 705 stay should have been party-limited. *See Make the Rd. N.Y.*, 2025 WL 3563313, at *33-36 (statement of Millett & Childs, JJ.). But plaintiffs properly do not contend that the statement—issued in the necessarily abbreviated and tentative stay posture—is binding on this Court. And like plaintiffs' response brief, that statement fails to fully grapple with the textual indicia identified in the government's opening brief that Congress intended to incorporate equitable limitations on relief into the APA and with the legislative history making

explicit that Congress understood that § 705 relief would be party-limited. *See* Gov't Br. 45-46.

Plaintiffs cannot rely on (Br. 56-57, 60) the Supreme Court's decision in *CASA* to leave certain remedial issues open on remand, as that case involved "more complicated" arguments regarding the scope of relief required to redress the plaintiff States' injuries—indeed, one of the district courts in that case had concluded "that a universal injunction was necessary to provide the States *themselves* with complete relief." *CASA*, 606 U.S. at 853. Here, by contrast, plaintiffs have nowhere explained how an injunction running only to financial awards in which plaintiffs have an interest would not provide complete relief, and this Court should vacate the injunction to the extent it applies beyond such streams.

Nor are plaintiffs correct that the relevant scope of relief should encompass all of the associational plaintiff's members, rather than only those who have identified themselves in court and agreed to be bound. That necessary limitation on the proper relief derives from Article III and equitable principles. Plaintiffs' argument that they have standing to seek relief on behalf of all of their members (Br. 59-60) rests almost entirely on an overreading of *Students for Fair Admissions, Inc. v. President & Fellows of*

*Harvard College*, 600 U.S. 181 (2023). That case was brought by a plaintiff association that allegedly had 47 members and was proceeding, in one of the consolidated cases, on behalf of "four members in particular" who "filed declarations" stating their support for the lawsuit. *Id.* at 201. As the Court explained, where "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Id.*

That statement in no way permits an organization to proceed on behalf of tens of thousands of unnamed members. Here, the government does not dispute that the plaintiff organizations have standing to litigate on behalf of, and seek relief that runs to, identified members. Each plaintiff organization, however, is purporting to litigate on behalf of 20,000 or 30,000 more unidentified "members" who do not control the organization or this litigation and many of whom may not even know about the litigation or that they will be bound by an adverse judgment. Nothing in the Supreme Court's decision in *Students for Fair Admissions* undermines the commonsense rule that an organizational plaintiff may not assert claims held by unidentified members, without additional evidence establishing that those members in fact direct or control the organization.

And plaintiffs' argument (Br. 56-57) that the district court should properly enter a universal injunction as a matter of equity so that plaintiffs can receive the benefits of relief without identifying their members is no more persuasive. For one, plaintiffs' argument on this score only highlights the ways in which they are attempting to leverage organizational status into an end-run around the fundamental equitable principles discussed in *CASA* as well as class-action procedures. It would be fundamentally inequitable to allow unidentified members to obtain the benefits of a favorable ruling but not to risk any loss if the government prevails, and similarly improper for plaintiffs to bind unidentified members to adverse judgments without any process beyond a general allusion to being membership organizations.

Nor do plaintiffs' vague allusions to "constitutional problems regarding the freedom of association and privacy" advance their arguments. Br. 56 (quotation omitted). The government is not seeking to compel the plaintiff organizations to do anything; it is the plaintiff organizations that filed suit and sought to obtain relief for their members. In general, parties seeking relief in court must identify themselves; courts do "not usually allow parties to proceed anonymously based on generalized concerns." *June Med. Servs.*,

*LLC v. Phillips*, 22 F.4th 512, 520 n.5 (5th Cir. 2022). In abiding by any judgment, the government must know to whom relief runs.

## CONCLUSION

For the foregoing reasons, and those in the government's opening brief, the district court's preliminary injunction should be vacated or reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

*/s/ Brian J. Springer*
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

January 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,053 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer