# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 6, 2026 Decided August 21, 2026

No. 25-5148

NATIONAL COUNCIL OF NONPROFITS, ET AL.,
APPELLEES

v.

OFFICE OF MANAGEMENT AND BUDGET AND RUSSELL T. VOUGHT, IN HIS OFFICIAL CAPACITY AS DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00239)

*Brian J. Springer*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, and *Daniel Tenny* and *Sean R. Janda*, Attorneys.

*Jay A. Sekulow*, *Jordan A. Sekulow*, *Andrew J. Ekonomou*, *Benjamin P. Sisney*, and *Nathan J. Moelker* were on the brief for amicus curiae the American Center for Law and Justice in support of appellants.

*Jessica Morton* argued the cause for appellees. With her on the brief were *Kevin E. Friedl* and *Robin F. Thurston*.

*Allison Neswood* and *Katie E. Klass* were on the brief for amici curiae 8 Tribal Organizations in support of appellees.

Before: SRINIVASAN, *Chief Judge*, WILKINS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: This case involves a dispute over the proper interpretation of a short-lived federal funding memorandum issued by the Office of Management and Budget to the heads of all federal agencies. A week after President Trump took office for his current term, OMB issued Memorandum M-25-13, which directed agencies to temporarily pause grants, loans, and financial assistance programs in the wake of a series of executive orders released in the administration's first days. The Memorandum's issuance instantly sparked widespread chaos based on concerns that it called for an across-the-board halt to vital funding of essentially all federally funded programs. The next day, OMB issued a guidance document explaining that the Memorandum's funding pause had a narrower reach, tied to specific executive orders. Then, one day later—two days after the Memorandum's issuance—OMB rescinded it altogether.

Plaintiffs include organizations that receive federal funding and associations of such organizations. They brought this suit the day after the Memorandum issued, hours before it was to take effect, and the day before it was rescinded. Plaintiffs challenge the Memorandum's lawfulness, and their claims are grounded in their belief that the Memorandum called for a global freeze on all federal funding.

Acting quickly on Plaintiffs' request for emergency relief and the record before it, the district court entered a temporary restraining order and then a preliminary injunction barring the government from implementing the Memorandum. The preliminary injunction rests on the court's understanding that the Memorandum directed a categorical freeze on all federal financial assistance. The government now appeals.

We have no cause to question the district court's considered assessment in exigent circumstances of the most natural reading of the Memorandum, of the strength of Plaintiffs' legal challenges to it, or of the widespread effects and panic it caused. Rather, we vacate the preliminary injunction based solely on the likelihood that Plaintiffs' challenge to the Memorandum has become moot because the Memorandum was rescinded. Plaintiffs challenge the now-rescinded Memorandum itself; they do not challenge, for instance, the actions taken by executive agencies in carrying it out. In this sort of situation, discontinuation of the action being challenged has the effect of mooting the case if there is no basis for supposing the defendant might simply renew the challenged action after the lawsuit has concluded.

The government has likely made the requisite showing that it will not reissue the challenged Memorandum or one with the same allegedly unlawful features. Plaintiffs' challenge to the Memorandum assumes that it called for a global funding freeze, not the more tailored freeze contemplated by the government's interpretation. Assuming Plaintiffs have the better reading, the government has shown there is sufficiently little chance it would again attempt an across-the-board freeze of that kind: before the government even knew of any lawsuit, it issued a guidance document conveying to agencies that the Memorandum had not intended to establish a blanket freeze in

the first place; and throughout this litigation, the government has not sought to defend the lawfulness of any such global freeze or protect its ability to establish one in the future. In these circumstances, we conclude that Plaintiffs' challenge to the now-rescinded Memorandum is likely moot, and that the preliminary injunction therefore must be vacated.

I.

A.

On January 20, 2025, President Trump's first day back in office, he signed a series of executive orders addressing his administration's policy priorities. Several of the orders contained directives about the disbursement of federal funds.

For example, an order titled *Unleashing American Energy* directed agencies to ensure that no federal funds are "employed in a manner contrary to the principles" of encouraging certain "energy exploration and production" and guaranteeing the accessibility of "an abundant supply of reliable energy," "unless required by law." Exec. Order No. 14154 § 2(a), (c), (i), 90 Fed. Reg. 8353, 8353–54 (Jan. 20, 2025). The order required agencies to "immediately pause the disbursement of funds" under programs established by two federal statutes. *See id.* § 7(a), 90 Fed. Reg. at 8357. Other orders similarly directed agencies to assess their existing programs to ensure that federal funds are not disbursed in ways contrary to the administration's policies. *See, e.g.*, *Protecting the American People Against Invasion*, Exec. Order No. 14159 §§ 17, 18, 90 Fed. Reg. 8443, 8446, 8447 (Jan. 20, 2025); *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168 § 2(g), 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025); *Ending Radical and Wasteful*

*Government DEI Programs and Preferencing*, Exec. Order No. 14151 § 2(b)(ii), 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025).

B.

On January 27, 2025, Matthew J. Vaeth, Acting Director of OMB, issued Memorandum M-25-13, addressed to the heads of executive departments and agencies. Off. of Mgmt. & Budget, Exec. Off. of the President, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://perma.cc/JA22-QXSK. The Memorandum listed a "series of executive orders" that had just been issued by President Trump in the administration's first week, *id.* at 1–2, and then stated that, "[t]o implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders," *id.* at 2. The Memorandum instructed that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* The Memorandum set the funding pause to take effect at 5:00 p.m. the following day, January 28, 2025. *Id.*

The Memorandum instructed agencies to submit to OMB, by February 10, 2025, "detailed information on any programs, projects or activities subject to this pause." *Id.* Pending completion of OMB's review of the submitted information, the Memorandum required agencies to "pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open

awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law." *Id.* The Memorandum authorized OMB to grant exceptions "on a case-by-case basis." *Id.*

The next day, January 28, 2025, before the pause took effect, OMB issued a guidance to agencies about the Memorandum's scope, which the White House also publicly posted as a "Fact Sheet" about the Memorandum. *See* OMB Guidance (Jan. 28, 2025) ("Guidance"), J.A. 62–63; Donald J. Trump (2nd Term), *White House Fact Sheet: OMB Q&A Regarding Memorandum M-25-13* (Jan. 28, 2025), https://perma.cc/K5M2-Z7LP. The Guidance began by stating that the Memorandum directed agencies to "temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders." Guidance at 1, J.A. 62. Immediately following that introductory statement, the Guidance emphasized (in bold) OMB's explanation of the reach of the funding freeze: "**Any program not implicated by the President's Executive Orders is not subject to the pause.**" *Id.* The Guidance then relisted the specific executive orders enumerated in the Memorandum and stated that the Memorandum "establishes a process for agencies to work with OMB to determine quickly whether any program is inconsistent with the President's Executive Orders." *Id.*

In its first question and answer, the Guidance directly addressed and rejected the idea that the Memorandum instituted an across-the-board funding freeze:

> **Q: Is this a freeze on all Federal financial assistance?**

> A: No, the pause does not apply across-the-board. It is expressly limited to programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI, the green new deal, and funding nongovernmental organizations that undermine the national interest.

*Id.* The Guidance further explained that the Memorandum's funding freeze "is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law." *Id.* at 2, J.A. 63.

C.

On the same day (and at around the same time) that the Guidance issued, January 28, 2025, Plaintiffs filed this action challenging the previous day's Memorandum as unlawful. The complaint operates on the premise that the Memorandum effected a funding freeze of global sweep—that it "purports to eradicate essentially all federal grant programs" and "immediately suspend[s] the obligation or disbursement of all federal financial assistance." Compl. at 2 & ¶ 28 (J.A. 14, 22). Plaintiffs challenge the Memorandum on several grounds, including that it is arbitrary and capricious because it: "fails even to acknowledge the catastrophic practical consequences that an immediate, across-the-board freeze on federal grant programs will produce," fails "to provide a reasonable explanation why those consequences could possibly be warranted," and fails "to account for the substantial reliance interests" it "wipes away in an effort to freeze all financial assistance." *Id.* ¶¶ 46–47. Plaintiffs also challenge the Memorandum on the ground that OMB lacks statutory

authority "to unilaterally terminate all federal financial assistance programs across the entire government." *Id.* ¶ 60.

Among other relief, Plaintiffs sought a temporary restraining order and preliminary injunction barring OMB from implementing or enforcing the Memorandum. On the same day Plaintiffs filed their complaint, the district court, after an emergency hearing, granted administrative relief barring implementation of the Memorandum for several days—until February 3, 2025, the scheduled date of the hearing to consider Plaintiffs' request for a temporary restraining order.

D.

The next day, January 29, 2025, OMB rescinded the Memorandum. Off. of Mgmt. & Budget, *Memorandum for Heads of Executive Departments and Agencies* (Jan. 29, 2025), https://perma.cc/R39C-YZ7X. The rescission of the Memorandum took the same form as the Memorandum itself—a memorandum directed to the heads of all executive departments and agencies. The rescission memorandum states in its entirety: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel." *Id.*

Shortly after the rescission issued, White House Press Secretary Karoline Leavitt posted the following message on social media:

> This is NOT a rescission of the federal funding freeze.
>
> It is simply a rescission of the OMB memo.

> Why? To end any confusion created by the court's injunction.
>
> The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented.

Karoline Leavitt (@PressSec), X (Jan. 29, 2025, at 6:40 PM), https://perma.cc/6ZJG-9ZD8. Later that day, the government filed a notice of the rescission in the district court and moved to dismiss the complaint on the ground that the rescission of the Memorandum rendered Plaintiffs' challenge to it moot.

E.

On February 3, 2025, the district court granted Plaintiffs a temporary restraining order and rejected the government's submission that the rescission had mooted the case. As to the latter, the court explained that a defendant's voluntary cessation of challenged conduct—here, the rescission of the challenged Memorandum—can moot a case only if the defendant can show that its challenged conduct cannot reasonably be expected to recur. The court determined that the government could not make that showing. In reaching that conclusion, the court relied on the Press Secretary's statement that the rescission had left the "federal funding freeze" in place and on evidence that funding recipients continued to be denied funding.

As to the merits of Plaintiffs' challenge, the court held that they were likely to succeed on their arbitrary-and-capricious claim. And in concluding that Plaintiffs had demonstrated irreparable injury and that the public interest favored granting temporary relief, the court explained that a global "funding freeze threatens the lifeline that keeps countless organizations operational," causing the denial of critical services, and that

there had been a "nationwide panic in the wake of the funding freeze." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025).

On February 25, 2025, the court converted the temporary restraining order into a preliminary injunction. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025). The court reiterated the same grounds for rejecting the government's mootness argument. *Id.* at 117–19. On the merits, the court for the first time considered the Guidance that OMB had issued the day after the Memorandum. *Id.* at 122–23. The court noted the Guidance's statement that the Memorandum's funding pause, contrary to Plaintiffs' understanding, was a tailored rather than global freeze. The court concluded that the Guidance's language about the scope of the freeze could not be given effect, however, because it appeared to conflict with the Memorandum's terms and because the timing of the Guidance's issuance—only hours before the funding freeze took effect—left agencies with too little time to implement it. *Id.* at 123. The court then held that Plaintiffs are likely to succeed on both their arbitrary-and-capricious claim and their claim that OMB lacked statutory authority to establish an across-the-board funding freeze through the Memorandum. *Id.* at 124–27.

The resulting preliminary injunction bars OMB from "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives" in the Memorandum with respect to disbursement of funds under all open awards. *Id.* at 130–31. The injunction also orders OMB to notify all agencies addressed by the Memorandum that they should not "take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in [the Memorandum] with respect to the disbursement of Federal Funds under all open awards" and

should "continue releasing any disbursements on open awards that were paused due to [the Memorandum]." *Id.*

F.

The government now appeals the preliminary injunction. Given that the preliminary injunction is premised on the understanding that the Memorandum sought to effect an across-the-board funding freeze, which the government continues to deny, one might wonder why the government even cares to appeal the preliminary injunction. That is, if the preliminary injunction only bars the government from enforcing an ostensibly global freeze that the government believes was never intended in the first place, why is the government even constrained by the preliminary injunction in a way that matters to it?

The government says it cares because of the preliminary injunction's framing. *See* OMB Br. 39–40. Whereas Plaintiffs sought a preliminary injunction barring OMB's implementation and enforcement of only the Memorandum itself, *see* Compl. at 18 (J.A. 30), the injunction entered by the district court ranges further, encompassing "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in [the Memorandum]," 775 F. Supp. 3d at 130. That language, according to the government, could be read to restrict OMB from making funding decisions on an agency-wide or program-wide—i.e., "non-individualized"—basis as opposed to a grant-by-grant basis, and the uncertainty over the preliminary injunction's scope led the government to appeal and seek the injunction's vacatur. Plaintiffs do not suggest that the government lacks standing to appeal, and we think the government has something sufficiently concrete at stake to

substantiate its standing to seek vacatur of the preliminary injunction.

II.

To obtain a preliminary injunction, a party must show, among other things, a likelihood of success on the merits of its claims. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). For purposes of that inquiry, "the likelihood that the court has jurisdiction over a claim and the likelihood that the claim is meritorious both bear on the claim's ultimate prospects." *Mullin v. Doe*, 146 S. Ct. 2121, 2137 (2026). "So in evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits. If they conclude that a claim fails on either ground, they must deny interim relief." *Id.*

Here, we need address only the likelihood that there is no longer jurisdiction over Plaintiffs' challenge to the Memorandum because it has been rescinded. We thus have no occasion to review the district court's considered assessment, under exigent circumstances, of "the likelihood that [Plaintiffs' challenge would] succeed on the merits," assuming there is jurisdiction to resolve it. *Id.* We do not review, then, the district court's conclusion that Plaintiffs' reading of the Memorandum's terms is the more natural one, nor do we question the district court's assessment that the funding freeze was "ill-conceived from the beginning" and "irrational, imprudent, and precipitated a nationwide crisis." 775 F. Supp. 3d at 125. Rather, we conclude as a matter of jurisdiction that the Memorandum's rescission likely renders Plaintiffs' challenge to it moot, thus requiring vacatur of the preliminary injunction.

A.

"Derived from Article III, the mootness doctrine ensures that federal courts decide only 'actual, ongoing controversies.'" *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1127 (D.C. Cir. 2024) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). Because the controversy must remain "ongoing," events may transpire during litigation that render a once-live case moot, such that a decision can no longer affect the parties. *See id.*; *Samma v. Dep't of Def.*, 136 F.4th 1108, 1113 (D.C. Cir. 2025).

One such situation is when the government rescinds a challenged policy. "As we have repeatedly recognized, 'the government's abandonment of a challenged regulation is just the sort of development that can moot an issue.'" *Samma*, 136 F.4th at 1113 (quoting *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1203 (D.C. Cir. 2020)). Plaintiffs in this case exclusively seek forward-looking declaratory and injunctive relief concerning the Memorandum. Compl. at 18–19 (J.A. 30–31). In that circumstance, if the challenged policy is rescinded and hence "no longer exists, we can do nothing to affect [a plaintiff's] rights relative to it, thus making [the] case classically moot for lack of a live controversy." *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016); *see Samma*, 136 F.4th at 1113–14; *Larsen v. U.S. Navy*, 525 F.3d 1, 4–5 (D.C. Cir. 2008).

That is what happened here. When OMB rescinded the Memorandum after Plaintiffs brought their suit, the instrument that Plaintiffs had challenged as unlawfully directing a global funding freeze was no longer legally operative. That is "just the sort of development that can moot" a case. *Samma*, 136 F.4th at 1113 (citation omitted). Whether the rescission of the

Memorandum in fact did moot Plaintiffs' challenge turns on the application of the voluntary cessation doctrine, as Plaintiffs recognize, Pls.' Br. 42, and to which we turn next.

B.

While the government's rescission of a challenged policy *can* result in the case becoming moot, the government—like any defendant—does not "automatically moot a case by the simple expedient of suspending its challenged conduct after it is sued." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (internal quotation marks omitted). Instead, the voluntary cessation doctrine generally imposes an added burden on a defendant who argues that a pending case has been mooted by its ceasing the challenged conduct: "a defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *Id.* (internal quotation marks omitted). If a party were able to moot a challenge without needing to make such a showing, it could simply "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *Id.* So, "[t]o show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways." *Id.* (internal quotation marks and brackets omitted); *see Samma*, 136 F.4th at 1113–14; *Pub. Citizen*, 92 F.4th at 1128–30.

1.

The government has likely made the requisite showing here. Plaintiffs challenge the Memorandum on the ground that it unlawfully imposed an across-the-board funding freeze. While the government disputes whether the Memorandum in fact involved a global freeze or instead a more tailored one, we assume Plaintiffs will prevail on the merits of their arguments

in assessing whether jurisdiction exists. *See Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 106 F.4th 1134, 1141 (D.C. Cir. 2024). For purposes of the voluntary cessation doctrine, then, the question is whether the blanket freeze we assume was directed by the now-rescinded Memorandum can "reasonably be expected to recur." *Fikre*, 601 U.S. at 241.

We believe not. The key to understanding why is to consider the Guidance about the Memorandum released the day after the Memorandum itself. According to Plaintiffs, the Guidance was issued "in apparent response to the widespread chaos the [Memorandum] had produced." Pls.' Br. 25. In reaction to that chaos, the Guidance emphasized at its outset that the funding freeze should not be considered a global one: "**Any program not implicated by the President's Executive Orders is not subject to the pause.**" Guidance at 1, J.A. 62. Then, in its first question-and-answer, which specifically addressed whether the pause was "**a freeze on all Federal financial assistance**," the Guidance reconfirmed: "No, the pause does not apply across-the-board. It is expressly limited to the programs, projects, and activities implicated by the President's Executive Orders." *Id.*

Without deciding whether the Guidance in fact conveys the most natural interpretation of the Memorandum's terms, the Guidance at least establishes the following: as of the day after the Memorandum's issuance, the government wanted to ensure that the Memorandum not be understood to have directed an across-the-board freeze. The government, that is, broadcast to agencies and the public that it had no desire to establish a global freeze on federal funding, even if the previous day's Memorandum might have been read (or perhaps misread) to indicate otherwise.

For purposes of the voluntary cessation doctrine, the timing of the Guidance is pivotal. There is no reason to suppose the government had any awareness of Plaintiffs' lawsuit when it issued the Guidance. True, the record does not establish the exact timing of the release of the Guidance versus the filing of the lawsuit, both of which occurred on January 28, 2025. But it appears they happened roughly contemporaneously: Plaintiffs evidently filed their suit shortly after noon, and they had received a copy of the Guidance by around 1:30 p.m. 775 F. Supp. 3d at 110, 123. Whatever may have been the precise sequence, Plaintiffs do not—and could not—suggest that the Guidance was released with awareness of their challenge, much less that the Guidance could have been prepared in response to the challenge. (Nor could the Guidance have been prepared in response to a separate challenge to the Memorandum filed later that day in Rhode Island. *See* Compl. ¶ 3, *New York v. Trump*, No. 25-cv-00039 (D.R.I. Jan. 30, 2025).)

That means the government should be understood to have made clear its disinterest in an across-the-board freeze before knowing about—and thus for reasons having nothing to do with—Plaintiffs' challenge to such a freeze. In that context, there is little reason to suppose that, when the government rescinded the Memorandum the next day, it did so to elicit a dismissal of the case so as to preserve its freedom to later (re)institute an across-the-board freeze without any judicial bar in the way. Having already announced its disinterest in a blanket funding freeze before it knew about Plaintiffs' challenge to the Memorandum, the government cannot be seen to have rescinded the Memorandum as a means of preserving its ability to (re)institute just such a freeze.

The voluntary cessation doctrine's object, as noted, is to prevent a defendant intent on continuing its challenged conduct

from being able to "suspend [the] conduct after being sued, win dismissal, and later pick up where it left off." *Fikre*, 601 U.S. at 241; *see Samma*, 136 F.4th at 1113–14; *Pub. Citizen*, 92 F.4th at 1128. Here, far from suspending its challenged conduct after being sued so that it could pick up again after the suit's dismissal, the government had already demonstrated its disinterest in the challenged conduct before it knew about any lawsuit in the first place.

In these circumstances, it is unclear whether the voluntary cessation doctrine comes into play. Our decisions establish that the doctrine "does not apply automatically whenever the prospect of mootness is raised by a party's voluntary conduct." *Pub. Citizen*, 92 F.4th at 1128. The doctrine will not apply if there is no indication of any manipulation of the court's jurisdiction to preserve the ability to revert to the challenged conduct. *See id.*; *Samma*, 136 F.4th at 1114. This case might fall within that exception. But at any rate, assuming the doctrine applies, the government has likely met its burden to show there is no reasonable expectation it would impose a global funding freeze if the case were dismissed: it had already made clear it had not wanted to impose such a freeze by the time the case started.

That conclusion is fortified by the distinctive context of the Memorandum and its next-day clarification in the Guidance. Those events took place as a presidential administration freshly in office proclaimed a blitz of new policy priorities. To the extent the Memorandum was understood to direct an across-the-board funding freeze rather than one tethered more closely to the new initiatives, the government quickly announced it had no such intent. In accord with that clarification, the government has maintained throughout this litigation that it had not intended to institute a global funding freeze, and the government does not attempt to

defend such a freeze in this appeal. Those circumstances reinforce the lack of expectation that the government would want to (re)institute a blanket funding freeze akin to the alleged one if the case were dismissed.

2.

Plaintiffs' efforts to resist that conclusion fall short. Plaintiffs submit that the Guidance should not be given effect and that the rescission amounted to little more than a gesture. Those arguments fail to offset the takeaway from the Guidance that an across-the-board funding freeze cannot reasonably be expected to recur (to the extent it occurred to begin with) and that the challenge to the now-rescinded Memorandum thus is likely moot.

a.

Plaintiffs contend that the Guidance's next-day interpretation of the now-rescinded Memorandum is unpersuasive and should not control. But whatever may have been the more natural reading of the Memorandum's terms at first glance, the second-glance understanding quickly set by the Guidance the following day meant the government had already clarified—before knowing about Plaintiffs' challenge—that it did not wish to direct an across-the-board freeze, no matter how the previous day's Memorandum may have been read. That is what matters for purposes of the voluntary cessation doctrine.

In all events, Plaintiffs err in contending that the Guidance's interpretation of the Memorandum cannot govern. In support of that proposition, Plaintiffs rely on the idea that an agency's after-the-fact interpretive guidance does not control the proper interpretation of a binding regulation issued under statutory authority. *See Thomas Jefferson Univ. v. Shalala*, 512

U.S. 504, 512 (1994); *Peabody Midwest Mining, LLC v. Mine Safety & Health Admin.*, 70 F.4th 602, 607 (D.C. Cir. 2023). That may be true, but it is because the post hoc guidance rests on a different legal footing than the law it seeks to interpret, in much the same way that legislators' subsequent comments about the meaning of enacted legislation do not control the interpretation of a statute. *See Kisor v. Wilkie*, 588 U.S. 558, 628 (2019) (Gorsuch, J., concurring). The Memorandum, by contrast, is an OMB policy directive addressed to executive branch agencies; and there is no reason an ensuing OMB Guidance (which was also publicly posted by the White House) cannot clarify, amend, or supersede the prior OMB communication. Indeed, the Guidance refers to the Memorandum itself as a "guidance." Guidance at 1, J.A. 62.

Plaintiffs also point out that the Guidance was issued just hours before the Memorandum was to take effect, leaving insufficient time for affected agencies to incorporate the Guidance into their initial implementation of the Memorandum. Of course, the Memorandum itself had been issued only the day before it took effect. At any rate, even if it is highly likely—if not inevitable—that the rapid sequence of events would have caused a great deal of confusion for agencies trying to comply with OMB's two directives in short order, that still does not indicate that the government might try in the future to institute an across-the-board funding freeze of the kind it had already disavowed before knowing about Plaintiffs' challenge. Plaintiffs have not explained why any interim confusion between the time of the Guidance and the following day's rescission should bear on whether the rescission moots their challenge.

b.

Plaintiffs also question the import of the rescission. There could be no question about the operative force of the rescission on the Memorandum's directions to agencies: upon the Memorandum's rescission, its now-rescinded directives no longer controlled. That is the object of a rescission. And here, the rescission was issued in the same fashion as the Memorandum it rescinded: as an OMB memorandum addressed to all heads of executive departments and agencies. Whatever the Memorandum had directed those recipients to do, the rescission annulled that directive. Plaintiffs do not suggest, for instance, that OMB's issuance of the rescission memorandum to agencies was a diversionary ruse and that there was in fact an additional, under-the-table directive to agencies to disregard the rescission sent to them and instead continue abiding by the Memorandum. The rescission, then, directly implicates the understanding that "the government's abandonment of a challenged regulation is just the sort of development that can moot an issue." *Samma*, 136 F.4th at 1113 (internal quotation marks omitted).

In resisting that conclusion, Plaintiffs rely heavily on the White House Press Secretary's social-media message about the rescission. In that message, she said: "This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo." Leavitt (@PressSec), *supra*. She added: "Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented." *Id.*

That message, especially as understood in the context of the previous day's Guidance, is essentially in keeping with the net effect of the rescission. But to the extent there remained

any confusion between the two, the rescission presumably would govern, both for purposes of our review and for those of agencies seeking to implement it. The rescission, like the Memorandum, is an executive branch directive from OMB to the heads of executive departments and agencies. The Press Secretary's social-media message is an outward-facing sum-up intended for the consumption of the media and general public. It would not be a surprise if a shorthand message of that variety were couched in a manner aimed at instilling an impression thought to be politically advantageous, even if not scrupulously even-handed and fulsome in its account.

Particularly when viewed through that lens, the Press Secretary's message is not incompatible with the upshot of the rescission. Recall what the previous day's Guidance had sought to clarify: that there was not an across-the-board freeze but instead one targeted at executive orders that had been issued in the new administration's first week. Some of those executive orders contained their own directives to review or halt funding streams in their domains. So, when the Press Secretary said there had not been a "rescission of the federal funding freeze," it was true that, under those executive orders, a pause on federal funding instituted by the new administration persisted. Consistent with that understanding, the Press Secretary's statement reiterated that the "Presidents EO's on federal funding remain in full force and effect." To be sure, a global funding freeze was not in effect after the rescission; but the Guidance had already conveyed that there had been no intent to issue such a freeze anyway. Ultimately, the Press Secretary's statement resembles the framing of the rescission itself in that they both say that the Memorandum is rescinded but that implementation of the executive orders remains in place. *Compare* Leavitt (@PressSec), *supra* (Press Secretary statement) *with* Off. of Mgmt. & Budget, *Memorandum for*

*Heads of Executive Departments and Agencies*, *supra* (rescission memorandum).

What about the Press Secretary's indication that the rescission sought "[t]o end any confusion created by the court's injunction"? Is that an acknowledgment of an effort to manipulate the court's jurisdiction in a way that would raise concerns under the voluntary cessation doctrine? We do not think so. The Guidance communicating the government's disinterest in an across-the-board funding freeze had already been issued the previous day, before the executive branch became aware of any lawsuit. For the government, continuing to litigate the clarified-then-rescinded Memorandum might confuse matters by suggesting it in fact wanted a blanket freeze of the kind that it had disavowed but that Plaintiffs challenge in this case. (The government says it has nonetheless continued to litigate this case due to the framing of the preliminary injunction later entered. *See supra* p. 11.)

In their effort to cast doubt on the import of the rescission, Plaintiffs rely not only on the Press Secretary's characterization of it, but also on evidence that funding freezes subsisted to some degree post-rescission. But there would be no reason to infer solely from the fact of some lingering funding freezes that the now-rescinded Memorandum had not in fact been rescinded. The persistence of funding freezes after the rescission could stem in some measure from agencies' continued implementation of executive orders that themselves called for funding pauses—as contemplated by the Guidance, the Press Secretary's statement, and the rescission itself. More fundamentally, there could be a lag period for the rescission to take full effect in some instances for agencies that had turned off funding streams in attempting to comply with their reading of the now-rescinded Memorandum—especially because agencies were in the position of trying to keep pace with rapidly

evolving guidance within a short period, aptly described by the district court as a time of "nationwide chaos and paralysis." 775 F. Supp. 3d at 114.

Even assuming an agency might somehow affirmatively decide to persist with a funding freeze in reliance on the Memorandum notwithstanding its rescission, that action might support a suit against such an agency for failing to act in accordance with the rescission. But that would be a different action than the one we consider here. This case involves an action against OMB and its officials—not against an agency implementing an OMB directive—and this action is aimed solely at the now-rescinded Memorandum. As to the action we have before us, there is likely no point in enjoining OMB to cease implementing a Memorandum it has already rescinded.

In that respect, this case differs from *New York v. Trump*, 171 F.4th 1 (1st Cir. 2026), in which the First Circuit upheld a preliminary injunction against the same Memorandum after its rescission. There, the district court, in rejecting the government's mootness argument, explained that the suit in that case not only challenged the Memorandum and OMB's implementation of it, but also challenged "other agency actions," including agencies' implementation of funding freezes under preexisting executive orders. 769 F. Supp. 3d 119, 132 n.4, 134 (D.R.I. 2025). The district court concluded that the Memorandum's rescission thus did not moot the challenge. *Id.* at 134. In sustaining the preliminary injunction in relevant part, the First Circuit noted that challenge encompassed agency actions to freeze funds that predated the Memorandum, such that the Memorandum's rescission did not have the effect of mooting the full extent of the relief sought by the plaintiffs. 171 F.4th at 16. The First Circuit also rested on a district court factual finding that the Memorandum's substantive effect carried on even though the Memorandum

had been rescinded. *Id.* In those circumstances, the First Circuit did not expressly consider the implications of the Guidance in connection with mootness.

The challenge in this case, unlike the one in *New York v. Trump*, seeks no relief independent of the Memorandum. Because the Memorandum has now been rescinded, no effective relief can be granted as to it. And because the Guidance had already made clear the government's disinterest in an across-the-board funding freeze before OMB knew about Plaintiffs' challenge, we conclude that the voluntary cessation doctrine likely does not stand in the way of finding the challenge moot. Plaintiffs thus have not demonstrated a likelihood of success for purposes of obtaining a preliminary injunction.

* * * * *

For the foregoing reasons, we vacate the preliminary injunction.

*So ordered.*